UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
                                    :
V.S., individually and on behalf of her infant child,  :
T.S.,                                        :
                                    :         **OPINION AND ORDER**
                  Plaintiffs,           :
                                    :         07-cv-213(DLI)(JO)
                  -against-             :
                                    :
NADIRA MUHAMMAD, individually and as      :
caseworker; NATALIE ARTHUR, individually and as :
supervisor; BRENDA WILSON, individually and as  :
manager; JOHN MATTINGLY, individually and as   :
Commissioner; DEBRA ESERNIO-JENSSEN,      :
individually and as physician; LONG ISLAND     :
JEWISH MEDICAL CENTER, NORTH SHORE –   :
LONG ISLAND JEWISH HEALTH SYSTEM, INC.  :
and CITY OF NEW YORK,                :
                                    :
                  Defendants.       :
                                    :
------------------------------------------------------------------ x
DENES Q. and ANN MARIE C., individually, and on :
behalf of their infant daughter, Y.Q.,         :
                                    :
                  Plaintiffs,           :
                                    :
                  -against-             :         07-cv-1281(DLI)(JO)
                                    :
JANET CAESAR, individually and as caseworker;   :
JOSETTE LAFOND-FAVIERE, individually and as  :
supervisor; YSRNISI HOLLOWAY, individually and :
as supervisor; DEANNA JOHNSTON, individually and :
as supervisor; SHERLEY FERGUSON, individually  :
and as manager; JOHN MATTINGLY, individually   :
and as commissioner; DEBRA ESERNIO-JENSSEN, :
individually and as physician; NORTH SHORE     :
UNIVERSITY HOSPITAL AT FOREST HILLS;    :
LONG ISLAND JEWISH MEDICAL CENTER;     :
NORTH SHORE – LONG ISLAND JEWISH       :
HEALTH SYSTEM, INC.; and CITY OF NEW     :
YORK,                                     :
                                    :
                  Defendants.      :
------------------------------------------------------------------ x

**DORA L. IRIZARRY, United States District Judge:**

In each of the above-captioned cases, the infant plaintiffs were alleged to have suffered serious injuries while they were not in the presence of their parents. When the parent plaintiffs discovered the injuries, they promptly sought medical attention. At the hospitals to which the infants were taken, both not only received medical care, but also were screened for signs of child abuse. A pediatrician diagnosed their injuries as the result of physical abuse. The parent plaintiffs could not explain the cause of the injuries and the hospitals, pursuant to their obligation under state law, reported the pediatrician's suspicions to the state. New York City's Administration for Children's Services ("ACS") then investigated and prosecuted the parents for child abuse in the Queens County Family Court, which removed the infants from parental custody. The infants were separated from the parent plaintiffs for an extended period of time – more than a year in one case and two months in the other. The child abuse charges were eventually dismissed against the parents, who along with the infants, filed suit in this court against the pediatrician, the hospitals involved, and their common corporate parent (collectively the "medical defendants"),[1] as well as ACS caseworkers, their supervisors, ACS Commissioner John Mattingly, and the City of New York ("the City")(collectively, the "City defendants").

Plaintiffs claim that defendants' conduct violated their rights under the Constitution as well as federal and state laws. They assert federal law claims under 42 U.S.C. § 1983 ("Section 1983") for violation of their constitutional rights under the First, Fourth and Fourteenth Amendments. They also bring state law claims of malicious prosecution, unlawful interference

---

[1]     Both complaints name as medical defendants Dr. Debra Esernio-Jenssen, the pediatrician at Schneider Children's Hospital ("SCH"), the Long Island Jewish Medical Center ("LIJ Medical Center"), which operates SCH, and the North Shore-Long Island Jewish Health System, Inc. ("NS-LIJ Health Systems"), which controls LIJ Medical Center. The 07cv1281 complaint also names as a defendant, the North Shore University Hospital at Forest Hills ("FHH"), another facility controlled by NS-LIJ Health Systems. The court refers to LIJ Medical Center, NS-LIJ Health Systems, and FHH collectively as the "medical institutions."

with parental custody of children, unlawful imprisonment, gross negligence and medical malpractice.[2]

The medical defendants move to dismiss the complaints for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). As to plaintiffs' federal claims, made pursuant to 42 U.S.C. § 1983 ("Section 1983"), they contend that they are not state actors and cannot be held liable under Section 1983. They also invoke the Rooker-Feldman Doctrine to argue that the court does not have jurisdiction over claims that effectively challenge Family Court rulings. On plaintiffs' state law claims, they contend that they are statutorily immune under state law.

The City defendants in the Denes Q. matter (Docket No. 07-cv-1281) move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Their counterparts in the V.S. matter (Docket No. 07-cv-213), based on partial discovery, move for summary judgment pursuant to Fed. R. Civ. P. 56. Both sets of motions largely rely on claims for qualified immunity.

The court considers these four motions in tandem. For the reasons set forth below, the motions are granted as to plaintiffs' malicious prosecution claim under Section 1983. The City defendants' motion for judgment on the pleadings in the Denes Q. matter is also granted as to plaintiffs' abuse of process claim. The motions are denied as to all other claims.

## I.    Factual background on the Rule 12 motions

The court first considers the three Rule 12 motions based on factual allegations in the complaint. The court accepts as true all well-pleaded and plausible factual allegations and draws all reasonable inferences in the plaintiff's favor. *See Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir. 1999) and *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007).

---

[2]     Plaintiffs in the *Denes Q.* matter (07-cv-1281) also allege defamation by the City defendants for failure to notify the State Central Register of Child Abuse and Maltreatment ("Central Register") that they had withdrawn the charges against the parent plaintiffs.

The factual recitation below is supplemented by information to which the court has taken judicial notice.

## A.    The V.S. matter (Docket No. 07-cv-213)

On August 19, 2004, V.S. placed her son T.S. in the care of her mother Ve.S., and left their residence in Forest Hills, Queens to run errands. (Compl. ¶ 22 (07cv213 ECF Dkt. Entry No. 1)). When she returned, she noticed that her son's right leg appeared swollen (*Id*. ¶ 23).  When the swelling worsened, she took him to the emergency room at SCH in New Hyde Park, New York, a facility operated by the LIJ Medical Center (*Id*. ¶¶ 12 & 23).  Doctors there took an X-ray of T.S.'s leg and determined that he had suffered a fracture of the right femur.  (*Id*. ¶ 24). The infant was admitted to the hospital for in-patient care.  Plaintiffs contend that the infant should have been released as soon as a cast was placed his leg. (*Id*. ¶ 30).

On August 20, 2004, Dr. Debra Esernio-Jenssen, a pediatrician at SCH, examined T.S., reviewed his medical records, and concluded that V.S. had shaken the infant or inflicted such severe head trauma that the infant had in fact suffered a fractured skull and internal brain hemorrhage. (*Id*. ¶ 27).  Plaintiffs contend that this diagnosis was false as the infant had only suffered a broken leg. (*Id*. ¶ 28).  Dr. Esernio-Jenssen refused to discharge T.S. to his mother and admitted the infant to SCH, which the plaintiffs contend, was done to gather evidence of child abuse. (*Id*. ¶ 31-32).  Dr. Esernio-Jenssen ordered full-body X-rays and an MRI scan of the head, which revealed no skull fracture or brain hemorrhages.  (*Id*. ¶¶ 31-35).  Nevertheless, the medical defendants contacted the Central Register of the New York State Office of Children and Family Services and reported that V.S. had shaken T.S.  (*Id*. ¶¶ 36-37).  The Central Register forwarded the matter to ACS, which dispatched its investigators to SCH. (*Id*. ¶¶ 39-41). At the hospital, an ACS investigator and Dr. Esernio-Jenssen jointly questioned V.S. about her son's injuries. (*Id*. ¶

43). When she was asked how T.S. sustained the injury, V.S. was unable to provide an explanation. (*Id.* ¶ 43). Dr. Esernio-Jenssen allegedly told the ACS investigator that the infant's head trauma was caused by his mother, and his leg fracture had occurred while he was in the care of his grandmother. (*Id.* ¶ 43).

On August 24, 2004, pursuant to Article 10 of the Family Court Act, ACS filed an abuse petition with the Family Court in Queens County, alleging that V.S. and her mother, Ve.S., had abused T.S. (*Id.* ¶ 46). More than a year later, on October 17, 2005, during the Family Court trial on the abuse petition in which several physicians including Dr. Esernio-Jenssen testified, the ACS withdrew the petition against V.S. and amended the petition to allege medical neglect against the grandmother, Ve.S. (*Id.* ¶ 49). ACS then restored infant T.S. to the care of his mother after almost 14 months of separation. (*Id.*). On November 22, 2006, the Family Court held that Ve.S. had medically neglected the infant T.S. and placed his physical well-being in imminent danger.

The Family Court Judge found that while V.S. was away from the home in the afternoon of August 19, 2004, Ve.S. slipped in the kitchen while holding T.S. in her arms. (*In re T*[.] *S*[.], Dkt. No. NA-13963/04, Decision and Order of Judge Barbara Salinitro (Queens County Fam. Ct. Nov. 22, 2006), attached as Exh. A to Affidavit of Jonathan B. Bruno ("Bruno Aff.", 07cv213 ECF Dkt. Entry No. 16), at 18). Ve.S. did not disclose the fall to her daughter until after the infant had been taken to the emergency room. (*Id.* at 10 & 17). Ve.S. testified that prior to August 19, she had never fallen with the child, had any accidents with him or shaken him. The Family Court deemed her failure to inform V.S. as medical neglect because it delayed his access to medical care. On January 16, 2007, V.S., on behalf of herself and her son, filed Civil Action No. 07cv213. (07cv213 Compl. ¶ 16).

**B.  The Denes Q. matter (Docket No. 07-cv-1281)**

On January 4, 2006, Ann-Marie C. took her 22 month-old infant daughter, Y.Q., to her regular babysitter and went to work. (Compl. ¶¶ 25-26 (07cv1281 ECF Dkt. Entry No. 1)).  Later in the day, the babysitter transferred the child to the care of Y.Q.'s paternal grandmother.  When Y.Q.'s father, Denes Q., returned home that evening, he discovered a discoloration on Y.Q.'s rib cage. (*Id.* ¶¶ 27-28).  That night, Denes Q. and Ann-Marie C. brought Y.Q. to the emergency room at FHH in Forest Hills. (*Id.* ¶¶ 28-29).  FHH filed a report with the Central Register, reporting that the infant had been abused by burning and her parents were perpetrators of the abuse (*Id.* ¶ 33).  The next day, FHH, which could not itself provide in-patient pediatric care, transferred the infant to SCH. (*Id.* ¶ 32).

At SCH, Dr. Esernio-Jenssen examined Y.Q. and concluded that the infant had been burned by a hot liquid and that the burn was not accidental but the result of child abuse by the parents.  (*Id.* ¶¶ 39-40, 45).  The doctor allegedly then ordered the infant to undergo a retinal scan and a full skeletal survey.  Plaintiffs contend these "very invasive procedures" were unrelated to the treatment for the burn, and were conducted "purely for investigative reasons." (Transcript of Oral Argument before the Hon. John Gleeson, Aug. 3, 2007, ("8/3/07 Tr.") at 25).[3] On January 7, 2006, the SCH gave Y.Q. medical clearance to be discharged, but Dr. Esernio-Jenssen and the LIJ Medical Center held the infant in protective custody.  The City defendants, acting *ex parte*, continued the protective custody until January 10, 2006. (07cv1281 Compl. ¶¶ 50-51, 54).

Some time between January 4 and 10, 2006 the Central Register forwarded the case to

---

[3]     Due to the related nature of the T.S. and Denes Q. matters, the Denes Q. matter was transferred from Judge Gleeson to the undersigned pursuant to Local Rules 15(a) & 16 of the Eastern District of New York.

ACS for investigation. On January 10, 2006, ACS filed an abuse petition in Queens Family Court, naming the parents, as well as the paternal grandmother and the babysitter as respondents. (*Id*. ¶¶ 52-53; Art. 10 Petition, Exh. A to Sweet Decl.). Plaintiffs allege that ACS's petition relied solely on misinformation by Dr. Esernio-Jenssen (07cv1281 Compl. ¶¶ 52, 68, 85). That same day, at a proceeding held with the parents present and represented by counsel, the Family Court Judge ordered the temporary removal of Y.Q. from her parents and placed her in the care of her godparents under ACS supervision (*Id*. ¶ 54; Exh. B & C to Declaration of Emily Sweet ("Sweet Decl." 07cv1281 ECF Dkt. Entry No. 21)). The Family Court Judge ruled that continued parental custody would be "contrary to the welfare and best interests of the child because [the infant] had suffered third degree burns with no plausible explanation by respondents as to how she sustained such burns." (Exh. C to Sweet Decl.).

On January 27, 2006, Y.Q. received a skin graft at the Staten Island University Hospital. The burn specialist who performed the procedure determined that the burn was accidental. (07cv1281 Compl. ¶ 55; Exh. 2 to Declaration of Carolyn A. Kubitschek ("Kubitschek Decl." 07cv1281 ECF Dkt. Entry No. 28) at 7). The procedure was performed without the consent of Y.Q.'s parents, who could not attend to her without the presence of hospital staff. From January 27 to February 5, 2006, Y.Q. remained hospitalized at the Staten Island University Hospital. (07cv1281 Compl. ¶ 55).

On February 9, 2006, ACS admitted to the Family Court that Y.Q.'s burn was caused by an accident that did not occur in the presence of her parents, and agreed to restore Y.Q. to her parents' custody under supervision. (*Id*. ¶ 56; Exh. 2 to Kubitschek Decl. at 7-8). In all, the infant was separated from her parents for about two months. On March 27, 2006, ACS withdrew the abuse petition against the parents but continued proceedings against the grandmother and

babysitter (07cv1281 Compl. ¶ 59; Exh. D & E to Sweet Decl.). That same day, Denes. Q. and Ana Q., on behalf of themselves and their daughter, filed Civil Action No. 07-cv-1281.

### C.    Dr. Debra Esernio-Jenssen

Dr. Esernio-Jenssen, the SCH pediatrician who made the initial child abuse diagnoses in both cases, is alleged to be under contract with ACS as a consultant who assists and advises the agency in investigating and prosecuting cases of child abuse and neglect. (07cv213 Compl. ¶16; 07cv1281 Compl. ¶ 20).[4] Plaintiffs accuse her of being "zealot" who has a history of giving misleading or incorrect diagnoses, detecting cases of alleged child abuse and removing supposedly abused children from their parents. (07cv213 Compl. ¶¶ 18-19, 45; 07cv1281 Compl. ¶ 22). She is also accused of carrying out an SCH policy or practice of removing children from their parents without probable cause to believe that the children had been neglected or abused. (07cv213 Compl. ¶ 52). The VS plaintiffs assert that ACS should have known about Dr. Esernio-Jenssen's track record of unreliable child abuse diagnoses and acted unreasonably in relying on her diagnoses to remove the children from parental custody.

The plaintiffs gave no other facts to amplify their assertions against Dr. Esernio-Jenssen in their complaints. However, the court takes judicial notice of two recent decisions from other judges in this district that document instances of misdiagnosis by this doctor. In the first case, Dr. Esernio-Jenssen, identified as a pediatric specialist in the Child Protection Consulting Team at the SCH, examined a six-month old infant who was found not breathing by his parents and later died at the hospital in 2002. *See Cornejo v. Bell*, Nos. 04-cv-341 & 06-cv-2910 (BMC)(SMG), slip op. at 4 (E.D.N.Y May 16, 2008). In *Cornejo*, she determined that the infant's injuries were inflicted by shaking (shaken baby syndrome) and did not occur naturally. *Id*. Dr. Esernio-

---

[4]    Medical defendants deny that Dr. Esernio-Jenssen is under City contract. (8/3/07 Tr. at 8).

Jenssen deemed incredible, the father's explanation that he had "smacked [the infant's] back" to burp him, and conveyed to an ACS investigator her suspicion that the father had violently shaken the baby. *Id.* Her diagnosis prompted the removal of the infant's 18-month old brother to foster care. Despite a preliminary autopsy showing the infant's rib injuries to be the result of a congenital bone malformation, not fractures from shaking, she refused to alter her shaken baby syndrome diagnosis in her testimony before a Family Court judge. *Id*. at 7 & 8. A final autopsy report concluded that the infant's death was caused not by the shaken baby syndrome but a rare and natural heart defect. *Id.* at 9. Eventually, ACS reached the same conclusion and withdrew the child abuse petitions against the parents in the Family Court. *Id.* at 11. The infant's brother was separated from his mother for about three months.

In the second case, Dr. Esernio-Jenssen determined in November 2004 that a nine-month infant's minor wrist fracture was caused by the violent shaking of his arm by one or both of his parents. *Estiverne v. Esernio-Jenssen*, No. 06-cv-6617 (NG)(RLM), slip op. at 2 (E.D.N.Y. July 31, 2008). She reported her suspicions to the Central Register, refused to discharge the child to her parents, cancelled an MRI examination that had been scheduled to test for bone disease, and ordered a skeletal survey to detect for signs of child abuse instead. *Id*. at 2-3. A radiologist at SCH who reviewed the X-ray refused to characterize the fracture as the result of abuse, and the initial ACS investigation found the injury was accidental. *Id*. at 4 & 5. A second ACS investigation, supported by the diagnosis of Dr. Esernio-Jenssen, led to a child abuse petition against the parents in Family Court, which removed the infant and his two siblings to foster care. Ten months later, ACS withdrew the petition against the parents. *Id*. at 5. The parents were separated from their children for more than eight months.

Plaintiffs' counsel, in opposing the V.S. City defendants' motion for summary judgment,

referenced a Family Court decision in which the judge questioned Dr. Esernio-Jenssen's methodology and criticized her unprofessional courtroom demeanor. (*See In re A[.] C[.] D[.]*, Corrected Decision and Order Upon Fact-Finding by Judge Rhea Friedman (Queens County Fam. Ct.)(redacted), attached as Exh. 19 to Declaration of Carolyn A. Kubitschek in Support of Additional Discovery Pursuant to Rule 56(f) (07cv213 ECF Dkt. Entry No. 43)). In that case, an infant taken to the emergency room by her parents on February 19, 2004, was found to have a skull fracture. The parents explained that the infant had been dropped accidentally by their fifteen-year old daughter in the presence of their other children. The other children confirmed this account, but Dr. Esernio-Jenssen was skeptical. She interpreted the CT scan as showing multiple fractures that amounted to evidence of a pattern of child abuse. Another doctor, however, determined that the other suspected fractures were actually a form of a developmental anomaly common among Latin American infants. The parents told Dr. Esernio-Jenssen that a previous ACS investigation of child abuse in their family proved unfounded and that the father used to drink before ceasing the habit when he converted to evangelical Christianity. Nonetheless, Dr. Esernio-Jenssen believed that the father's alcoholism combined with what she speculated as "economic stressors" on the immigrant family led to prior abuse of the infant. Her belief prompted ACS to gain protective custody over the child. The Family Court found the parents to be very credible and seriously questioned Dr. Esernio-Jenssen's methodology, including her failure to consider contrary objective medical findings and her focus on the family's economic and immigrant status. The court found Dr. Esernio-Jenssen's emphasis on ethnic and religious issues odd and even distasteful." (*Id.* at 18). She gave the court the impression that once she "had formed an intuitive judgment," she "would make almost any argument to back it up." (*Id.* at 23). The court found it "odd that Dr. Jenssen so rigidly rejected any alternative to her favored

scenario (of child abuse) despite advice given from her own child abuse team." (*Id.* at 22). The Family Court was also disturbed by her combative courtroom presence, contempt for the family's attorney and "overly dramatic hand gestures." (*Id*. at 23). The ACS petition against the parents in that case was dismissed.

## II.     The V.S. and Denes Q. medical defendants' motions to dismiss

The medical defendants move to dismiss the Section 1983 claims against them pursuant to Fed. R. Civ. P. 12(b)(6), claiming that, as private actors, they had committed no state action that could give rise to federal liability. They also claim that several of the Section 1983 claims require the court to review Family Court decisions in a way that is barred by the Rooker-Feldman Doctrine. They argue that state law immunity shields them from plaintiffs' state law claims. The court considers the two motions in tandem, starting with the federal claims.

### A.     Standard of Review for the 12(b)(6) Motions

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to make a motion to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In *Bell Atlantic Corp. v. Twombly*, the Supreme Court retired the standard set forth half a century ago in *Conley v. Gibson*, that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," in favor of the requirement that plaintiff plead enough facts to "state a claim to relief that is plausible on its face." *Twombly*, 127 S. Ct. 1955, 1968-69, 1974 (2007) (quoting *Conley*, 355 U.S. 41, 45-46 (1957)). Under *Twombly*, a complaint cannot make merely "a formulaic recitation of the elements of a cause of action," but must allege facts that "raise a right of relief above the speculative level on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1964-65 (citations omitted).

The Second Circuit has interpreted the foregoing language to "requir[e] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*," rather than to mandate a "universal standard of heightened fact pleading." *Iqbal v. Hasty*, 490 F.3d at 157-58.

When material outside the complaint is "presented to and not excluded by the court, the motion must be treated as one for summary judgment . . . and all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). For the purposes of this rule, however, the complaint is deemed to include writings and documents attached to the complaint, referenced in the complaint, or integral to the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); Fed. R. Civ. P. 10(c). The court may also consider "matters of which judicial notice may be taken." *Brass v. Am. Film Tech.*, 987 F.2d 142, 150 (2d Cir. 1993); Fed. R. Evid. § 201(b).

Plaintiffs are harmed when material outside the complaint is considered on a motion to dismiss because they lack notice that such consideration is taking place. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). Rule 12(d)'s conversion requirement remedies this problem by "deter[ring] trial courts from engaging in fact finding when ruling on a motion to dismiss and ensur[ing] that when a trial judge considers evidence dehors the complaint, a plaintiff will have an opportunity to contest defendant's relied-upon evidence by submitting material that controverts it." *Id.* Accordingly, where there is actual notice by the opposing party of all the information in the movant's papers, the necessity to convert a motion to dismiss to one for summary judgment is largely dissipated. *Chambers*, 282 F.3d at 153.

All of the facts in § I, *supra*, or set forth below that are not alleged in the complaints are

drawn from materials of which both parties had notice or cases of which the court has taken judicial notice.

**B.      Section 1983 claims**

**1.      State Action**

Section 1983 of Title 42 of the U.S. Code holds "every person who, under color of any statute . . . subjects . . . any . . . person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, . . . liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  Civil Rights Act of 1871 §1, 42 U.S.C. § 1983.  To maintain a Section 1983 action, the injured party must allege (1) "that some person has deprived him of a federal right," and (2) "that the person who has deprived him of that right acted under color of state . . . law."  *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005)(citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

Action taken under color of state law includes the "misuse of state power" that a wrongdoer "possesses by virtue of state law" and acting while "clothed with the authority of state law."  *United States v. Giordano*, 442 F.3d 30, 42-43 (2d Cir. 2006)(citations omitted). Generally, private conduct is not proscribed by the Fourteenth Amendment and does not give rise to Section 1983 claims.  *Perez v. Sugarman*, 499 F.2d 761, 764 (2d Cir. 1974).  Sometimes, "actions of private entities may be considered to be infused with 'state action' if those private parties are performing a function public or governmental in nature and which would have to be performed by the Government but for the activities of the private parties." *Id*. at 765.  When "conduct that is formally private [] become[s] so entwined with governmental policies or so impregnated with a governmental character [such private conduct may] become[] subject to the constitutional limitations placed on state action." *Id*. at 764 (internal quotations omitted). Whether private conduct qualifies as state action often requires a fact-intensive inquiry.  "Only

by sifting facts and weighing circumstances of each case can the nonobvious involvement of the State in private conduct be attributed its true significance." *Id*. (internal quotations omitted).

In *Kia P. v. McIntyre*, one of the defendants, a privately owned and administered hospital in New York, delayed the discharge of a newborn infant to the care of her parents for two weeks because the infant's urine initially tested for positive for methadone. 235 F.3d 749 (2d Cir. 2000). The hospital retained the infant to observe her symptoms of methadone withdrawal, a serious medical condition, and to confirm the accuracy of the initial drug test. The hospital, pursuant to its duty under N.Y. Soc. Serv. Law § 413, also reported the infant's test and the mother's history of drug addiction to the City's Child Welfare Administration, the predecessor of ACS. That agency issued a hold on the infant's discharge. When the urine test returned negative, the infant was medically cleared for discharge, but the hospital kept her in protective custody for two more days as it sought and eventually received clearance to release from the agency.

The Second Circuit found the hospital's acts of testing, retaining and observing the infant were undertaken in its role as a private medical care provider, and were not state actions subject to liability under Section 1983. *Kia*, 235 F.3d at 756. However, the hospital's continued retention of the infant after she was medically cleared for discharge was undertaken solely in its social welfare role. *Id*. at 757. In this role, the hospital acted as "an instrumentality of the government" pursuant to its state law obligations and was "part of the reporting and enforcement machinery for the [government agency]". *Id*. at 757, 758. The Second Circuit deemed the hospital's continued retention of the infant for two days to be state action, because the private hospital was performing a protective custody function that would have been done by the government. Had state law not required the hospital to keep the hold on the infant, the government agency could have compelled the transfer of the infant to its care to prevent her

release to her parents.

To the extent the hospital's medical care provider and social welfare roles coincided during the period of time in which the hospital retained the infant for medical treatment and to protect her from suspected child abuse, the Second Circuit in *Kia* found no basis for Section 1983 action against the hospital. The Circuit reasoned that, if the mother and child's liberty interests were already deprived by the hospital acting in its care provider role, they could not at the same time be deprived by the hospital acting in its social welfare role. *Id*. at 757. Thus, it is only when the medical treatment ended and the hospital continued to hold the child from parental custody on behalf of the state, that the hospital acted with the color of state law. The question thus presented to the court in the instant cases is whether the actions taken by the medical defendants constitute state action under *Kia*.[5]

---

[5] Plaintiffs in the V.S. matter seek sanctions against the medical defendants' counsel for failing to cite the *Kia* decision in his legal brief in support of the motion to dismiss. They contend that the omission was knowing because counsel was informed of *Kia* through proceedings in a related case in February 2007, and moved to dismiss this case in May 2007. (See Exh. 1 to Declaration of Carolyn A. Kubitschek in Opposition to the Medical Defendants' Motion to Dismiss , (07cv213 ECF Dkt. Entry No. 20)). Plaintiffs contend that the motion is meritless and needlessly multiplied proceedings in this case.

Under 28 U.S.C. §1927, an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *See also* Fed. R. Civ. P. 11(b)(2)(requiring attorneys who present written motions before the court to certify that to their best knowledge the claims advanced are warranted by existing law or by a nonfrivolous argument). In weighing whether to impose sanctions on a party or its attorney during the course of litigation, the court bears a heavy responsibility and should proceed with caution. Sanctions impose a financial burden on the party and its attorney contrary to the American rule, and carry the condemnation of the lawyer's professional conduct. *See Schlaifer Nance & Co. v. Warhol*, 7 F. Supp. 2d 364, 372 (S.D.N.Y.1998) (internal citations omitted); *see also Knipe v. Skinner*, 19 F.3d 72, 78 (2d Cir. 1994) (noting that "Rule 11 sanctions should be imposed with caution").

Though *Kia* is the controlling precedent on the state action question, the court declines to sanction counsel because it is not so "patently clear" that the motion he filed, when objectively considered, "has absolutely no chance of success." *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986).

### a. The V.S. medical defendants

V.S. placed her son, T.S., in the care of the hospital on August 19 or 20, 2004, and the Family Court authorized ACS to take protective custody of T.S. on August 24, 2004. During the four intervening days, the hospital apparently took protective custody of the child. It is not clear whether the hospital was holding the child for medical reasons for this entire period. Plaintiffs contend that, after doctors at SCH diagnosed the infant T.S. with a leg fracture and placed the fractured leg in a cast, he should have been medically cleared for discharge. Dr. Esernio-Jenssen refused to discharge the infant following the initial fracture diagnosis either on August 19 or 20, 2004. She ordered more diagnostic tests – a full-body X-ray and an MRI head scan. From the limited record at this stage of the proceedings, the court cannot definitively conclude that these tests were undertaken for "purely non-medical" reasons to detect signs of child abuse. The tests could have served a medical purpose such as to rule out other injuries that the child may have suffered. Nor can the court determine whether the doctor's participation in the ACS interviews of the mother was to gather facts for medical care or to build a case for suspected child abuse. If the plaintiffs' contention is true that the hospital did continue to hold the infant for a time beyond when he was ready to be medically discharged, then the hospital's further protective retention of the child was done under the color of its state law obligation to prevent child abuse. The plaintiffs have pleaded a plausible case that LIJ Medical Center, through the SCH, exercised its social welfare role apart from its care provider role in retaining T.S. Such actions would subject the medical defendants to liability under Section 1983. Accordingly, the V.S. medical defendants' Rule 12(b)(6) motion is denied on this ground.

### b. The Denes Q. medical defendants

In this case, the infant Y.Q. apparently was cleared for medical discharge on January 7,

2006, but the hospital kept her in custody until January 10, 2006. During this period, the plaintiffs contend that Dr. Esernio-Jenssen helped to build the case of child abuse by ordering additional medical tests unrelated to the skin burn, which plaintiffs contend was purely for investigative purposes. It is plausible, based on the facts pled, that the hold on the infant from January 7 through January 10 was done solely for protective reasons. Therefore, the Denes. Q. medical defendants' Rule 12(b)(6) cannot dismiss the Section 1983 claims for lack of state action.

### 2. Rooker-Feldman Doctrine

The medical defendants further contend that several of plaintiffs' Section 1983 claims are barred by the Rooker-Feldman Doctrine because those claims require the court to review and reject prior rulings by the Family Court. They reason that to determine whether they unreasonably searched and seized the infant plaintiffs and interfered with the parents' rights to the custody of their children and direct their medical treatment, the court must decide whether the medical defendants had reasonable cause to justifiably impinge upon the said rights. They suggest that the Queens County Family Court, by issuing the preliminary removal order of Y.Q. and finding Ve.S. guilty of medically neglecting her grandson T.S., had found probable cause of child abuse in each case. Those rulings, they contend, retrospectively validated their actions in taking the infants into protective custody and conducting medical examinations without the consent of their parents, thus barring plaintiffs' federal law claims under the Rooker-Feldman Doctrine. Plaintiffs' Section 1983 claims, they insist, invite this court to review or reject the Family Court's rulings or become inextricably intertwined with those proceedings. These arguments are based on an overly expansive reading of the Rooker-Feldman Doctrine that has been explicitly rejected by the U.S. Supreme Court and is rejected herein.

The Rooker-Feldman Doctrine denies federal jurisdiction to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court

proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). It establishes "the clear principle that federal courts lack subject matter jurisdiction over suits, that are, in substance, appeals from state-court judgments." *Hoblock*, 422 F.3d 77, 84 (2d Cir. 2005). For the doctrine to apply, a case or claim must meet four requirements:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must complain of injuries caused by a state-court judgment. Third, the plaintiff must invite district court review and rejection of that judgment. Fourth, the state-court judgment must have been rendered before the district court proceedings commenced-*i.e.*, Rooker-Feldman has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.

*Id*. at 85 (identifying the four requirements articulated in *Exxon Mobil*) (quotations omitted).

The Rooker Feldman Doctrine is unavailing to the medical defendants for several reasons. First and foremost, plaintiffs did not lose in the Family Court proceedings, as the child abuse petitions against the two mother plaintiffs were both withdrawn by ACS. The Family Court did not issue any final judgment against any of the plaintiffs here. In the V.S. matter, the child abuse petition was withdrawn against the mother, and the Family Court's ruling of medical neglect was directed at Ve.S., the grandmother, who is a not a party here. The thrust of the Family Court's decision is different from the inquiry presented in this case; the ruling does not preclude the claims by the mother here. The Family Court found that Ve.S., the grandmother, was medically neglectful in the four hours from the time of her fall to the time when her daughter discovered the injury to T.S. and sought medical attention. There is no indication of any sort of neglect or abuse on the part of the mother at any point throughout the unfortunate affair.

Prior to *Exxon Mobil*, some circuits, including the Second, extended the Rooker-Feldman Doctrine to non-final state court interlocutory orders. *See e.g.*, *Campbell v. Greisberger*, 80 F.3d 703, 707 (2d Cir. 1996); *Doe & Assoc. Law Offices v. Napolitano*, 252 F.3d

1026, 1030 (9th Cir.2001). But *Exxon Mobil* makes clear that for Rooker-Feldman to apply, the state court proceedings must have "ended," *Exxon Mobil*, 544 U.S. at 291, producing "state-court losers," *id*. at 284, before the federal action begins. Since the state proceeding must have ended, the doctrine cannot bar a federal action attacking an interlocutory state court order. *See TruServ Corp. v. Flegles, Inc.,* 419 F.3d 584, 591 (7th Cir.2005) (stating that "an interlocutory ruling does not evoke the doctrine or preclude federal jurisdiction"); *Dornheim v. Sholes*, 430 F.3d 919, 923-24 (8th Cir.2005); *Guttman v. Khalsa*, 446 F.3d 1027, 1032 (10th Cir. 2006). Regardless, the complaints in these two cases are not seeking to reverse the Family Court's temporary removal of the infants as those orders were terminated by the Family Court itself, with the consent of ACS. Reading the criteria of the *Exxon Mobil* plainly, the medical defendants do not satisfy the first or second requirements.

The medical defendants also assert that since several of the Section 1983 claims in question here and the Family Court rulings both require findings as to the existence of probable cause of child abuse, the adjudication of these claims would be "inextricably intertwined" with the Family Court findings. The operative phrase, "inextricably intertwined," taken from footnote 16 of *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 463, 483 (1983), formerly served as an independent ground for the application of Rooker-Feldman Doctrine. *See Moccio v. New York State Office of Court Admin.*, 95 F.3d 195, 198-199 (2d Cir. 1996)(defining what it meant to be "inextricably intertwined") and *Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir. 2002) (following *Moccio* and describing the extension of Rooker-Feldman's bar from cases that "effectively seek review of judgments of state courts" to "claims before the district court that are 'inextricably intertwined' with the state court's determinations.). The *Exxon Mobile* holding explicitly rejected *Moccio*'s expansive interpretation of this phrase, and emphasized that the

Rooker-Feldman Doctrine cannot be broader than the rules of claim and issue preclusion under state law. 544 U.S. at 283. The Second Circuit subsequently explained that the phrase "'inextricably intertwined" is merely a "label" that has no "independent content." *Hoblock*, 422 F.3d at 87.

Under New York's collateral estoppel doctrine, a claim will be estopped only if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir. 1996). This doctrine is also unavailing to the medical defendants. The only prior proceedings they can point to are the temporary removal hearings before the Family Court, which were hastily held on short notice, after each of the infants were removed from their parents. Those hearings did not afford the parent plaintiffs a full and fair opportunity to raise one of the central issues before this court – whether the medical defendants could reasonably rely on the diagnoses of Dr. Esernio-Jenssen whose belief in the existence of parental abuse led them to undertake state action that may have violated the plaintiffs' constitutional rights. Accordingly, the medical defendants' motions to dismiss under the Rooker Feldman Doctrine are denied as well.

### 3. Supplemental Jurisdiction

The denial of the medical defendants' motions to dismiss the federal claims also nullifies their request to have the court decline the exercise of supplemental jurisdiction and dismiss the state law claims pursuant to 28 U.S.C. § 1367(c)(3). As will be discussed in § II.C, *infra*, the court finds that the state claims presented in these cases arise out of a common nucleus of operative fact as the federal claims and do not present novel issues of state law. Therefore, the court, in its discretion, chooses to exercise its supplemental jurisdiction to the state law claims.

C.    State law claims

1.    The claim of state statutory immunity as to all state law claims

The medical defendants contend that statutory immunity under New York law shields them from all of plaintiffs' state law claims. Section 419 of New York's Social Services Law protects "[a]ny persons, official or institution" who is required to file a child abuse report or remove children into protective custody pursuant to their duty under [§ 424 of the Social Services Law], with immunity from any liability, civil or criminal, that might otherwise result by reason of such actions." (McKinney 2008).   The good faith of defendants acting under their statutory duty is presumed, but immunity does not extend to liability resulting from willful misconduct or gross negligence of the actor.   *Id*.   The underlying policy behind the granting of such qualified immunity is to encourage the reporting of child abuse situations, and thereby affording children greater protection.[6] *See van Emrik v. Chemung*, 220 A.D.2d 952, 953 (3d Dep't 1995).   To pierce the cloak of qualified immunity under § 419, a plaintiff must overcome the statutory presumption of good faith by showing "persuasive [evidence] of bad faith."   *Id*.

In both complaints, medical defendant Dr. Esernio-Jenssen is accused of reporting incorrect diagnoses of the infant's injuries that she knew or should have known to be false, or

---

[6]      New York law imposes an affirmative duty on physicians to report suspected cases of child abuse.   *See* N.Y. Soc. Serv. Law § 413 (McKinney 2008)(requiring physicians to report "when they have reasonable cause to suspect that a child coming before them in their professional or official capacity was abused or maltreated."); N.Y. Soc. Serv. Law § 417 (McKinney 2008) (requiring physicians to notify the police or ACS to take protective custody of the child, if there is "reasonable cause to believe that the circumstances or condition of the child are such that continuing in his place of residence or in the care and custody of the parent, guardian, custodian or in the care other person responsible for the child's care presents an imminent danger to the child's life or health."); N.Y. Soc. Serv. Law § 424(4)(a)(McKinney 2008) (requiring the physician's report to be filed with the State Central Register).   A physician or any other person mandated by the state to report suspected case of child abuse who willfully fails to do so is guilty of a class A misdemeanor and subject to civil liability.   N.Y. Soc. Serv. Law § 420 (McKinney 2008).

reported in reckless disregard for the truth. This accusation is supported in the V.S. matter by the additional fact that full-body X-rays she ordered for the infant T.S. did not appear to reveal any skull fracture or brain hemorrhage despite her report to the contrary. The apparent contradiction between the outcome of the X-ray and her report raises plausible inference of bad faith that could overcome the good faith presumption.

In the Denes Q. matter, the same doctor is accused of falsely reporting that Y.Q.'s chest burn was a hot liquid burn caused by parental abuse. Plaintiffs contend that Dr. Esernio-Jenssen was neither a skin or a burn expert and therefore was not qualified to offer such an opinion. This contention alone does not raise an inference of bad faith. However, plaintiffs also allege that the doctor made the allegedly false diagnosis to "advance her personal agenda." (07cv1281 Compl. ¶ 48). It is not clear what kind of ulterior motive she had, but this allegation when viewed in the light most favorable to the nonmoving party and combined with other instances of misdiagnosis by Dr. Esernio-Jenssen, creates an inference of plausible bad faith that would preclude immunity. Accordingly, the court finds that both complaints have made a sufficiently plausible showing of bad faith on the part of Dr. Esernio-Jenssen to overcome the good faith presumption accorded to the medical defendants by statute. Their invocation of state law immunity fails.

**2.      Denes Q. medical defendants' motion to dismiss individual state law claims.**

The medical defendants in the Denes Q. matter also moved to dismiss individual state law claims against them.

**a.      Malicious prosecution**

The Denes Q. medical defendants contend that they cannot be subject to a malicious prosecution claim, because they merely reported their suspicions of child abuse and did not commence the actions against plaintiffs. The decision to petition the Family Court, they insist,

was made by ACS, the City agency.

A child abuse or neglect proceeding under Article 10 of the Family Court Act is a civil proceeding. *People v. Smith*, 62 N.Y.2d 306, 309 (1984). Under New York State law, civil malicious prosecution claims contain seven (7) elements: (1) the commencement and prosecution of a judicial proceeding against the plaintiff, (2) by or at the insistence of the defendant, (3) without probable cause, (4) with malice, (5) which has terminated in favor of the plaintiff, (6) to her injury, and (7) that the plaintiff suffered interference with her person or property. *Sundbye v. Ogunleye*, 3 F. Supp. 2d. 254, 260 n.11 (E.D.N.Y. 1998)(citing *Realty by Frank Kay, Inc. v. Majestic Farms Supply, Ltd.*, 160 A.D.2d 789, 790 (2d Dep't 1990)).

Generally, "one who merely responds to requests for information or who testifies as a witness does not, by those acts, institute or continue a prosecution." *Babi-Ali v. City of New York*, 979 F. Supp. 268, 276 (S.D.N.Y. 1997). But if the defendant "gave information which he knew to be false and so unduly influenced the authorities" or if his "persuasion was the determining factor in inducing the [government's] decision" to prosecute, "he may be held liable." *Whittaker v. Duke*, 473 F. Supp. 908, 911 (S.D.N.Y. 1979); *see also Babi-Ali*, 979 F. Supp. at 276 (declining to grant judgment on the pleadings in favor of medical examiner who provided allegedly perjurious testimony but did not initiate the indictment). From the pleadings, it appears that Dr. Esernio-Jenssen's attribution of Y.Q.'s burn injury as inflicted by her parents was the determining factor in the decision of ACS to proceed against the parent plaintiffs. The charges were later dismissed but not until after the infant plaintiff was separated from her parents for two months. Moreover, as discussed in the previous section, there is reason to believe that her diagnoses were made in bad faith. Hence, the court finds that Dr. Esernio-Jenssen may be liable for malicious prosecution of the parent plaintiffs, and the medical defendants' motion dismiss this claim is

denied.

### b. False imprisonment

The Denes Q. medical defendants also contend that the complaint fails to state a claim for the false imprisonment of Y.Q. because plaintiffs cannot demonstrate that the infant was conscious of her confinement by the hospital. Under New York law, the elements of a false arrest or false imprisonment claim are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). The medical defendants point to *Sager v. Rochester General Hospital*, a case in which the court at trial granted the hospital's motion for judgment on the false imprisonment claim because the plaintiffs had submitted no proof that the infant plaintiff who was five-months old when held in protective custody, was conscious of his confinement, 169 Misc.2d 643, 647 N.Y.S.2d 408, (N.Y. Sup. Ct. 1996). At this stage of the proceedings, the court cannot, as a matter of law, hold that an infant who is almost two years old cannot be conscious of her prolonged separation from her parents. In the complaint, the plaintiffs allege that Y.Q., who was 22-months old at the time of her confinement, suffered "extreme humiliation, pain and suffering, terror, mental anguish and depression." (07cv1281 Compl. ¶ 105). If these assertions are true, and the court finds them to be at least plausible, then it would only be reasonable to assume that the infant was aware of her confinement and separation. *See Estiverne*, *supra*, at 20-21. At the pleadings stage, a plaintiff need not provide anything more than a sufficient notice to permit defendant to file an answer. *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 324 (S.D.N.Y. 2003). The complaint here gives defendants sufficient notice of the false imprisonment claim and provides a plausible showing

that the infant plaintiff may have been aware of her confinement. Plaintiffs have not had the opportunity to prove their case and need not do so to survive the motion to dismiss, which is also denied on this claim.

### c.   Medical malpractice

The Denes Q. medical defendants further contend that the complaint fails to establish a medical malpractice claim because it pleads no facts to suggest that Y.Q.'s injuries were exacerbated or mistreated while she was in their care. The two requisite elements of a medical malpractice claim are "a deviation or departure from accepted practice" and "evidence that such departure was a proximate cause of injury or damage." *Rebozo v. Wilen*, 41 A.D.3d 457, 458 (2d Dep't 2007). Generally, physicians who participate in the investigation of child abuse are immune from liability pursuant to Social Services Law § 419, but this immunity does not apply if a doctor is "guilty of willful misconduct or gross negligence such that the statutory presumption of good faith was overcome." *Goldberg v. Edson*, 41 A.D.3d 429, 429-30 (2d Dep't 2007). The complaint alleges that Dr. Esernio-Jenssen, in her professional capacity as a physician, misdiagnosed Y.Q.'s injuries as having been the result of child abuse and ordered invasive diagnostic tests that were unrelated to treatment for the infant's skin condition. Moreover, in relation to the medical defendants' state law immunity claims (*see* § II.C.1 *supra*), the court has found it plausible that the doctor may have acted in bad faith. Thus, the complaint sets forth a prima facie claim for medical malpractice that can overcome the physician's statutory immunity claim at this stage of the litigation. Accordingly, defendants' motion is denied as to this claim.

## III.   The Denes Q. City defendants' motion for judgment on the pleadings

The City defendants in the Denes Q. matter move for judgment on the pleadings pursuant

to Fed. R. Civ. P. 12(c) as to plaintiffs' Section 1983 claims, contending they have qualified immunity because the actions they took were objectively reasonable under the circumstances. They also argue that the complaint does not implicate a policy or practice of the City and does not state a constitutional violation by them. The plaintiffs oppose the motion and ask for leave to amend the complaint to add several factual allegations.

### A. Standard of review for Rule 12(c) motion

In deciding a Rule 12(c) motion for judgment on the pleadings, the court applies the same standards as those governing Rule 12(b)(6) motions. *Cleveland v. Caplaw Enter.*, 448 F.3d 518, 522 (2d Cir. 2006); *see also* § II.A, *supra*. The court must confine its consideration to the facts stated on the face of the pleadings, and to matters of which judicial notice may be taken. *Leonard F. v. Israel Disc. Bank*, 199 F.3d 99, 107 (2d Cir. 1999)(internal quotations omitted).

### B. The claim of qualified immunity on all federal claims

Qualified immunity protects government officials from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is "clearly established" if "[t]he contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Qualified immunity is an affirmative defense that the defendant has the burden of pleading. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

When a defendant invokes qualified immunity against charges that he violated the constitutional rights of another, the court considers the defense in three steps. First, the court must decide whether the facts, when viewed in the light most favorable to the plaintiff, show the defendant's conduct violated a constitutional right. *Gilles v. Repicky*, 511 F.3d 239, 244 (2d Cir.

2007); *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007). If the facts could establish a violation, then "the next . . . step is to ask whether the right was clearly established" in a given factual context or situation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Normally, a controlling precedent of the U.S. Supreme Court, the particular Circuit Court of Appeals or the highest court in the state is necessary to clearly establish federal law. Martin A. Schwartz & Kathryn R. Urbonya, *Section 1983 Litigation* 146 (2d Ed. 2008). Finally, even if the right were clearly established, a defendant could still be protected by qualified immunity if it was objectively reasonable for him to believe that his conduct did not violate the law. *Wilkinson v. Russell*, 182 F.3d 89, 103 (2d Cir. 1999). In other words, a defendant is permitted to have made a reasonable mistake about the state of the law and still be entitled to qualified immunity. *Saucier*, 533 U.S. at 205. The immunity determination depends largely on whether the law was defined with reasonable clarity or whether a reasonable defendant would have understood under existing law that the conduct was unlawful. *Wilkinson*, 182 F.3d at 102-03.

### 1. Alleged violations of constitutional rights

The Denes Q. complaint lists alleged deprivations of plaintiffs' rights under the First, Fourth and Fourteenth Amendments of the U.S. Constitution. More specifically, the City of New York and Commissioner Mattingly are accused of maintaining an ACS policy or practice of removing children from parental custody without probable cause of child abuse or neglect, which the other City defendants followed in seizing and separating Y.Q. from her parents. As a result, they are said to have deprived Y.Q. of her right to be free from unlawful seizures under the Fourth Amendment, her parents' interest caring for her, and all of plaintiffs' right to intimate associations as a family under the First and Fourteenth Amendments (Counts I, II, VII & VIII). The complaint also accuses the City defendants of using or failing to prevent the use of unreliable information from Dr. Esernio-Jenssen to prosecute the parent plaintiffs for child abuse,

which violated the parents' right to be free of malicious prosecution under the Fourth Amendment and abuse of process under the Fourteenth Amendment (Count III).

The Fourteenth Amendment's Due Process Clause provides heightened protection against government interference with certain fundamental rights and liberty interests. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). It is well-established that parents have a constitutionally-protected liberty interest in the care, custody and management of their children. *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999); *Wilkinson*, 182 F.3d at 103-104 (2d Cir. 1999)("a parent's interest in the custody of a child is a constitutionally protected liberty interest subject to due process protection")(citations omitted); *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)(the interest of a parent in the custody of his or her children is a "fundamental, constitutionally protected liberty interest."). This liberty interest "does not evaporate simply because [plaintiffs] have not been model parents." *Wilkinson*, 182 F.3d at 104 (internal quotations omitted).

The Due Process Clause also protects the relationship of children and their parents through a separate right of association, which includes the freedom of intimate association. *Patel v. Searles*, 305 F.3d 130, 135 (2d Cir. 2002)(citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984)).[7] Among the types of relationships protected under this doctrine, the ties "between members of a nuclear family deserve the most protection . . . because they are among the most intimate of relationships." *Patel*, 305 F.3d at 136. "As a general rule . . . before parents

---

[7]  The complaint also claims a right of intimate association under the First Amendment. The constitutional "source of the intimate association right has not been authoritatively determined," but courts have generally grounded the right on the liberty protected by the Due Process Clause of the Fourteenth Amendment. *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999). The "nature and extent of this right" under the First Amendment "is hardly clear" in the Second Circuit. *Id*. Thus, having recognized the right of plaintiffs' to intimate association under the Due Process Clause, the court declines to assess whether the plaintiffs are entitled to relief under a duplicate version of such right under the First Amendment.

may be deprived of the care, custody, or management of their children without their consent, due process – ordinarily a court proceeding resulting in an order permitting removal – must be accorded to them." *Tenenbaum*, 193 F.3d at 593. Hence, a state's *ex parte* removal of children from the custody of their parents raises procedural due process concerns. *Kia* at 759. The Fourth Amendment's guarantee of the right to be free from unreasonable searches and seizures by the government extends to children taken by child welfare workers from their parents' custody. *Tenenbaum*, 193 F.3d at 602.

From the facts asserted in the complaint, it is clear that the City defendants' *ex parte* actions in continuing the medical defendants' removal of Y.Q. violated the plaintiffs' procedural due process and the infant's Fourth Amendment rights. However, these rights do not "automatically override the sometimes competing government interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.'" *Kia*, 235 F.3d at 758 (quoting *Wilkinson*, 182 F.3d at 104). The City defendants removed Y.Q. pursuant to their statutory duty, under New York Social Services Law § 424(9), which obligates ACS to "take a child into protective custody to protect him from further abuse or maltreatment when appropriate and in accordance with provisions of the family court act." (McKinney 2008).

Separately, ACS workers are required to "take all necessary measures to protect a child's life or health including when appropriate, taking or keeping a child in protective custody, . . . without an order [from the Family Court] and without the consent of the parent or [legal guardian]" if there is "reasonable cause to believe" that the child's continuing residence in or in the care and custody of the parent "presents an imminent danger to the child's life or health" and "not enough time to apply for [a preliminary order of removal from the Family Court]." N.Y. Jud.

Ct. Acts § 1024(e) (McKinney 2008).

Child welfare caseworkers must balance between the competing interests of the state and family when they are confronted with situations of suspected child abuse. "If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. [But] [i]f they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights." *Kia*, 235 F.3d at 758 (citing *van Emrik v. Chemung County Dep't of Soc. Serv*., 911 F.2d 863, 866 (2d Cir. 1990). Courts recognize that ACS caseworkers must choose between these difficult alternatives and accord them with "unusual deference in the abuse investigation context." *Wilkinson*, 182 F.3d at 104.

## 2. Clearly-established Second Circuit precedent informing the legality of City defendants' actions.

The Second Circuit has established clear legal guidance on the proper balance between state interest and individual rights for child welfare caseworkers to follow when investigating suspected child abuse by parents. In *Tenenbaum v. Williams*, the Circuit held that state officials may take a child into protective custody "without court authorization or parental consent" in "emergency circumstances" which is present when "the child is immediately threatened with harm." 193 F.3d at 594. The state's removal of children from their parents under such circumstances would not violate the parents' and children's procedural due process rights. The Circuit emphasized the importance of "rendering State officials secure in the knowledge that they can act quickly and decisively in urgent situations and that the law will protect them when they do." *Id*. at 595. Only when the caseworkers have the discretion to act, can they properly safeguard a child's well-being. *Id.* Thus, the conduct of caseworkers in a child abuse "investigation will pass constitutional muster provided simply that [they] have a 'reasonable basis' for their findings of abuse." *Wilkinson*, 182 F.3d at 104 (citing *van Emrik*, 911 F.2d at 866.

The Circuit formulated a similar rule to address the Fourth Amendment concerns of the child being searched and seized by the state in these circumstances. If the child welfare workers possessed information that "would have warranted a person of reasonable caution" to believe that the child "was subject to the danger of abuse if not [taken into protective custody] before court authorization could reasonably have been obtained, then they had probable cause to remove the child without violating her Fourth Amendment rights." *Id*. at 605; *Nicholson v. Scoppetta*, 344 F.3d 154, 172 (2d Cir. 2003) ("there is no Fourth Amendment violation committed by ACS officials carrying out an *ex parte* removal where there was probable cause to believe that there existed facts to merit emergency removal under New York law").

Thus, whether caseworkers have reasonable basis or probable cause to act depends on the nature and quality of information uncovered in their investigation. In assessing what they knew, courts must be "especially sensitive to the pressurized circumstances routinely confronting caseworkers, [who must often decide] between 'difficult alternatives' . . . on the basis of limited or conflicting information." *Wilkinson*, 182 F.3d at 105 (citing *van Emrik*, 911 F.2d at 866).

### 3.      Objective reasonableness of the Denes Q. City defendants' conduct

Both sets of clearly established rules governing the removal of children turn on whether the information the City defendants possessed at the time would lead a person of reasonable caution to conclude that the child would be in immediate danger of abuse if drastic action were not taken. In this case, it is undisputed that Y.Q. had a serious burn to the chest that her parents could not explain. However, the presence of such an unexplained injury, by itself, is not a reason to conclude that the child faces further danger from her parents. The injury may have been, as plaintiffs contend, and as was later determined, the result of an accident. The caseworkers in this case also received a diagnosis from a pediatrician who described Y.Q.'s injury to be the result of parental misfeasance. This diagnosis suggested that the injury was intentionally inflicted, and

left open the possibility of future harm to the child. The City defendants contend that in light of this diagnosis, the caseworkers' belief in the imminent danger to the child was reasonable and their removal of Y.Q. into protective custody was justified under those circumstances.

If the case were limited to these facts, the City defendants would seem to have a strong case for qualified immunity under the clearly established and clearly deferential standard of the Second Circuit. The fact that the diagnosis later turned out to be inaccurate does not alter what the caseworkers knew when they decided to take Y.Q. into protective custody. However, the fact that the diagnosis came from Dr. Esernio-Jenssen, who the plaintiffs contend is neither a burn specialist nor a dermatologist, and is notorious for misdiagnosing injured infants as having been harmed by their parents, and aggressively seeking the erroneous removal of children from their homes, may significantly alter the picture of the case.

As a general matter, ACS caseworkers should consider properly the opinions of medical professionals. In this case, the court is troubled by plaintiffs' allegation that this particular pediatrician has a predilection for suspecting child abuse by parents when assessing injured infants, at times contrary to the objective medical evidence. Prior to her examination of Y.Q. in January 2006, Dr. Esernio-Jenssen had been incorrect in diagnosing injured infants as victims of parental abuse in the three cases described in § I.C, *supra*, and in the V.S. matter. Each of these four cases prompted ACS action that led to prolonged separation of children from parents. This additional background information calls into question the reliability of her diagnosis in this case, and, in turn, undermines the objective reasonableness of the ACS caseworkers' reliance on her to establish their reasonable basis and probable cause to remove Y.Q from her parents.

The plaintiffs seek to amend their complaint with the additional factual assertion that the City defendants knew or should have known Dr. Esernio-Jenssen to be unreliable. Such an

amendment is not necessary, as the court has taken judicial notice of the other cases this district and finds that ACS knew or should have known of the doctor's alleged reputation for misdiagnoses, which, if true, may lead a reasonable person to question the reliability of her diagnoses of child abuse. The City defendants may still have justifiable reasons to rely on Dr. Esernio-Jenssen's findings or other information to support their actions in this case. Based on the limited record at this stage of the proceedings, the court is unable to conclude as a matter of law that the ACS caseworkers here had information sufficient for an objectively reasonable person to find Y.Q. to be in imminent danger of abuse or to establish probable cause of such abuse. The motion for judgment on the pleadings based on qualified immunity is denied.

### C.     Validity of plaintiffs' *Monell* claim.

The Denes Q. City defendants also contend that plaintiffs cannot sustain Section 1983 claims against the City or Commissioner Mattingly because the complaint does not challenge a policy or practice of the City. Under *Monell v. New York City Department of Social Services*, a municipality is subject to liability under Section 1983 only when the violation of the plaintiff's federally protected rights can be attributable to the enforcement of a municipal policy, practice or decision of a final municipal policy maker. 436 U.S. 658 (1976); *see also Brandon v. Holt*, 469 U.S. 464, 471-72 (1984)(considering a suit against a municipal official in his or her capacity to be a suit against the municipality itself). A municipal policy or custom need not have received formal approval through the body's official decision-making channels to subject the City to liability under Section 1983. *Nicholson*, 344 F.3d at 165 (2d Cir. 2003).

A city may also be liable under Section 1983 by reason of its deliberate indifference to known custom or practice of its employees, for example, by failing to train employees to act otherwise. *Id.* A plaintiff may assert the municipality's indifference by demonstrating "(1) that a

policymaker of the municipality knows to a moral certainty that its employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 166-67 (internal citations omitted).

Based on the repeated instances of ACS caseworkers removing children from their parents on the basis of inaccurate diagnoses of child abuse by Dr. Esernio-Jenssen, it is apparent that the agency has a custom or practice of relying on her opinion in making decisions that affect the constitutional rights of injured infants and their parents. The Denes Q. plaintiffs are directly challenging this practice, or in the alternative, the indifference of the City and Commissioner Mattingly to train and inform its employees in light of the recurrence of such situations. The court finds it plausible that ACS maintained a custom of either relying on the questionable findings of Dr. Esernio-Jenssen or failed in its policy to adequately inform its workers as to the allegedly unreliable nature of her diagnoses. It is unclear whether the defendant caseworkers here knew about Dr. Esernio-Jenssen's track record. It is plausible that such knowledge would have altered their perception of danger to Y.Q. at the time they removed her or that they might have sought another opinion before believing there to be probable cause for abuse. For these reasons, the court declines to dismiss the claims against the City and Commissioner Mattingly.

### D. Malicious prosecution

Malicious prosecution is common-law tort that may be claimed under Section 1983 only if it implicates plaintiff's constitutional or federal statutory rights. *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995). In *Albright v. Oliver*, the U.S. Supreme Court determined that only violations of the Fourth Amendment could support Section 1983 claims for malicious

prosecution. 510 U.S. 266, 274-75 (1994). The Court reasoned that the various criminal procedure protections of the Fourth Amendment were intended to protect against arbitrary exercise of prosecutorial power. *Id*. at 273. Thus, "the Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person–*i.e.*, the right to be free of unreasonable or unwarranted restraints on personal liberty." *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995). To sustain a Section 1983 malicious prosecution claim, "there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004)(internal quotations omitted).

In this case, the complaint alleges that the parent plaintiffs were maliciously prosecuted for child abuse in Family Court. However, only the infant Y.Q.'s Fourth Amendment rights were violated when she was seized and searched. "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Tenenbaum*, 193 F.3d 581, 601 n.13 (*quoting Alderman v. United States*, 394 U.S. 165, 174 (1969)). The parents have not alleged any violation of their Fourth Amendment rights.[8] Accordingly, this claim does not survive the City and medical defendants' motions to dismiss.

### E.     Malicious abuse of process

The state law tort of malicious abuse of process is recognized by Section 1983 as a violation of one's procedural due process rights under the Fourteenth Amendment. *Cook v.*

---

[8]     In the past, a few federal courts have recognized malicious prosecution claims under Section 1983, finding the separation of parents from their children for an extended period of time satisfied a "special injury" requirement under state law. *See e.g.*, *Yuan v. Rivera*, 48 F. Supp. 2d 335, 348 (S.D.N.Y. 1999); *Providencia v. v. Schutlze*, No. 02-cv-9616 (LTS)(HBP) 2007 WL 1582996, at *5 n.3 (S.D.N.Y. May 31, 2007). These cases did not consider the Fourth Amendment implications to the plaintiff.

*Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). Therefore, unlike malicious prosecution, it does not require a deprivation of plaintiff's personal Fourth Amendment rights. To state an abuse of process claim, a plaintiff must establish that the defendant employed a regularly issued legal process to compel performance or forbearance of some act with the intent to do harm without excuse of justification, and in order to obtain a collateral objective that is outside the legitimate ends of the process." *Id.* "[T]he basis of the tort lies in the use of the process to gain a collateral objective, the accomplishment of which the process in question was not intended to secure." *Pagliarulo v. Pagliarulo*, 30 A.D.2d 840, 841 (2d Dep't 1968). *See also Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) ("a plaintiff must establish that the defendants had an improper *purpose* in instigating the action") (emphasis in original).[9]

The Denes Q. complaint provides no allegation of any collateral objective or purpose to do harm on the part of the City defendants in initiating the Family Court proceedings against the parent plaintiffs. "A malicious motive alone ... does not give rise to a cause of action for abuse of process." *Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (1984); *see also Hauser v. Bartow*, 273 N.Y. 370, 374 (1937) (finding no abuse of process because "whatever may have been respondent's motives, she used the process of the court for the purpose for which the law created it"). There is no indication that the City defendants used the Family Court proceedings for any purpose other than that for which the proceedings were designed for. This claim is dismissed but only as to the City defendants.

---

[9] "A wrong usually referred to as malicious abuse of process is committed when the actor employs legal process in a manner technically correct, but for a wrongful and malicious purpose to attain an unjustifiable end or an object which it was not the purpose of the particular process employed to effect. It differs from malicious prosecution in that it is not necessary to show that the action in which the process was used was without probable cause or that it terminated favorably to the plaintiff. The action is not for the wrongful bringing of an action or prosecution, but for the improper use, or rather abuse, of process in connection therewith." *Pagliarulo*, 30 A.D.2d at 840 (quotations omitted).

The claim remains against the medical defendants because Dr. Esernio-Jenssen is alleged to have zealously over-diagnosed child abuse to advance her agenda. *C.f. Dean v. Kochendorfer*, 237 N.Y. 384, 390 (1924) ("If a magistrate instigates a prosecution before himself without probable cause, and deliberately uses the process issued by him therein, not for the legitimate purpose of hearing the case, but to show his authority and to gratify his personal feelings of importance, the act savors of oppression . . . and constitutes an illegal abuse of process").

## V.     The V.S. City defendants' motion for summary judgment

The City defendants in the V.S. matter moved for summary judgment before any deposition discovery was taken.  Based on a partial record from the prior Family Court proceedings, they argue that there can be no dispute that they acted reasonably in seizing T.S. and filing the petition against V.S., and, therefore, are entitled to qualified immunity.  They also contend that the ACS caseworkers, to the extent they acted in a prosecutorial role, should be accorded absolute immunity.  Finally, they argue that the lack of any evidence implicating a personal role by Commissioner Mattingly warrants dismissal of the complaint against him.

The plaintiffs oppose the filing of the motion, asking instead for additional discovery beyond the Family Court record, which they contend would raise issues of material fact that preclude summary judgment.  Magistrate Judge James Orenstein permitted the City defendants to file the summary judgment motion and stayed any deposition discovery pending this court's review of the motion.  This court also declined to reinstate additional discovery.  However, after a detailed review of the summary judgment briefs, the parties' Rule 56.1 statements and attached exhibits, the court finds two areas of factual dispute that preclude summary judgment and require additional discovery.

The first question is whether it was objectively reasonable for the City defendants to rely

on the diagnosis of Dr. Esernio-Jenssen in suspecting V.S. as the cause of head trauma injuries to T.S. Dr. Esernio-Jenssen's medical report clearly led the ACS caseworkers to believe that V.S. may have caused a skull fracture and retinal hemorrhages in T.S., which prompted their emergency removal of him from her custody. The plaintiffs have raised a plausible issue of fact as to whether the reliance was reasonable given the doctor's alleged reputation for zealous over-diagnosis of child abuse by parents.

The second question concerns whether the City defendants continued to press the petition against V.S. in the Family Court after any probable cause for prosecuting her had dissipated, and unduly prolonged the separation of the mother from her son by five months. Again, the Family Court record does not resolve this issue and the plaintiffs have made a plausible showing that this could be a genuine issue of material fact.

## A.   Findings of Facts

The following facts are undisputed, unless otherwise specified.

### 1.   Central Register Reports

On Friday, August 20, 2004 at 2:41 am, ACS received the first report of suspected child abuse from the Central Register. (Rule 56.1 Stmt. (07cv213 ECF Dkt. Entry No. 38) ¶ 1; Exh. A to Declaration of Martin Bowe ("Bowe Decl.", 07cv213 ECF Dkt. Entry No. 36), 1324-1326). The "Call Narrative" of the report states:

> [V.S.] (mother) and grandmother have failed to explain how [T.S.]'s (age 2 months) right femur was fractured. The grandmother had the child in her care part of the day on 08/19/04 and mother picked up the child at 7 PM. This is when mother took notice of child's swelling, redness and obvious discomfort. Child will be admitted to the hospital.

(Exh. A to Bowe Decl. at 1326). At 3:00 pm on the same day, ACS received another report from the Central Register. (Rule 56.1 Stmt. ¶ 2; Exh. A to Bowe Decl., 1321-23). The Call Narrative adds:

On 8-19-02 [sic.] mother presented 2 month old [T.S.] with unexplained femur fracture and bruises. Today medical examination disclosed more injuries. The baby has a displaced frontal lobe/skull fracture as well as old and new retinal hemorrhages. Since mother and grandparents have [no] explanation, mother and grandparents are held accountable for the injuries.
. . . .
Mother and baby are in the hospital now. No arrests so far. ACS workers are already in the hospital with the baby.

(Exh. A to Bowe Decl., 1323). ACS Supervisor Natalie Arthur, a defendant in this case, reviewed the reports and conferred with co-defendant Nadira Muhammad, a caseworker, about investigating the case.[10] Muhammad then visited the Long Island Jewish Hospital where she interviewed V.S., M.C., the biological father of T.S., as well as Dr. Esernio-Jenssen. (56.1 Stmt. ¶ 3-4).

## 2. The ACS investigation

By the time Muhammad arrived at the hospital, other ACS workers had compiled considerable information about the situation. They learned that V.S. had left T.S. with her mother from 2-5 pm on the previous day, Thursday, August 19, 2004, in their shared residence in Forest Hills, Queens.[11] When V.S. returned, her mother, Ve.S. indicated that the baby was fine but a little gassy. Ve.S. also said that as she walked T.S. around the kitchen, he may have kicked the granite counter top. Later, V.S. when changing his diaper noticed her son's leg was swollen. At 8 or 9 pm that evening, the swelling worsened and the infant cried. She searched on the Internet for answers and then called his doctor, who directed her to take the infant to the emergency room. (ACS record filed 4:10 am on 8/20/04, Exh. B. to Bowe Decl., 1402-03).

---

[10] In ACS documents, defendant Muhammad's given name is spelled "Nadirah." (*See e.g.*, Exh. B to Bowe Decl., 1339).

[11] V.S. was a Ph.D. candidate at Cambridge University in England, and had lived separately from her parents until she fell ill after giving birth to T.S. (Declaration of V.S. ("V.S. Decl.", 07cv213 ECF Dkt. Entry No. 42), ¶ 4). She then moved to her childhood home to live with her parents. That afternoon, she had gone into Manhattan to shop at Barnes and Nobles and to get her hair done. (Exh. B to Bowe Decl., 1403; V.S. Decl. ¶ 10).

At the SCH, a division of the LIJ Medical Center, the examining physician, radiologist and orthopedist determined that T.S. had suffered a displaced mid-shaft femur fracture. (*Id*. at 1402). The medical staff also noticed a small red bruise on the right side of T.S.'s forehead and ordered a follow-up CT exam. The grandmother explained that while babysitting T.S. in the afternoon, she was carrying him around the house and may have brushed him against the granite counter top. This explanation was deemed by the medical staff to be a "possible" but "not conclusive" cause for the injury. (Exh. B to Bowe Decl., 1345). When told that the infant was diagnosed with head trauma as well as leg fracture, the mother said she did not know that T.S. had the injuries and could not explain the cause. (*Id*. at 1403). The grandmother later revealed to ACS that she had slipped and fallen in the kitchen while holding T.S. in her arms. She claims not to have noticed any marks or bruises on the baby, and did not inform her daughter of the fall until they were on their way to the hospital. (*Id*. at 1404).

In her interviews, Muhammad learned that shortly after giving birth to T.S. in June, V.S. fell very ill from infections and was unable to care for T.S. at night or during much of the day. She relied on her mother to care for the newborn. (Exh. B to Bowe Decl., 1401). The two women were the only primary caretakers of the child. (*Id*. at 1402). Muhammad learned from T.S.'s father, M.C., that his relationship with V.S. was no longer romantic but visited with their child at her parents' home. As for what happened the previous day, he confirmed the mother's account that she had left the infant with the grandmother in the afternoon. (*Id*. at 1404).

ACS concluded that the allegations of abuse to the Center Register were "substantiated" because neither V.S. nor her mother could explain how the infant had sustained a fractured skull and new and old retinal hemorrhages, which were deemed to be symptoms of the shaken baby syndrome. The agency maintained the case against V.S. because she was only away from the

child when her mother fell that afternoon but neither V.S. nor Ve.S. could not account for the "old injuries." (*Id*. at 1403).

### 3. Dr. Esernio-Jenssen's Medical Report

On Monday, August 23, 2004, ACS received a facsimile of a medical report from the LIJ Medical Center. (56.1 Stmt. ¶ 6). The five-page report was prepared by Dr. Esernio-Jenssen on August 20, 2004 at 6:30 pm at the request of the Child Protection Consultation Team. (Exh. 1 to Declaration of Bonnie Rabin ("Rabin Decl." 07cv213 ECF Dkt. Entry No. 41)). Dr. Esernio-Jenssen had met and spoken to V.S. briefly at 8:50 am on August 20 after reviewing diagnostic images of T.S., and again later in the day when the mother was interviewed by ACS.

According to the report, V.S. related that she had a healthy pregnancy and, despite problems with the delivery, the baby was born healthy, except for a "cone head." The infant stayed in the hospital for an extra seven days due to her mother's post-pregnancy illness, which kept V.S. bedridden for six weeks and made her dependent on her mother for care of the baby. The baby remained healthy and growing. At his last check up on July 27, 2004, his pediatrician reported good weight gain, normal development and no concern. Dr. Esernio-Jenssen confirmed this account with a call to the pediatrician. V.S. described the baby as "delightful, wonderful, smiley" who "coos and has good eye contact."

V.S.'s account of the previous day's events was consistent with that in the ACS records. Before V.S. left the home on the 19th, the baby was "perfect." Upon returning, she saw him sitting on the lap of his mother, who said that he had been gassy and cranky. V.S. fed the infant, and this calmed him for a time. When she picked him up, he turned cranky and could not be consoled. At around 6:30-7pm, while changing his diapers, she noticed that his leg appeared swollen. Her mother suggested that he had colic, so she researched colic on the Internet. When she changed his diapers again between 8-9pm, she noticed more obvious swelling and decided to

take him to the emergency room.

At the hospital, V.S. was asked whether she could imagine anyone hurting the infant. She stated, "not my father." Dr. Esernio-Jenssen then explained that the retinal hemorrhage and skull fracture and subdural were indicative of shaken baby syndrome. V.S. did not know what the syndrome was and when it was explained to her, began crying. She stated, "I did not." V.S. then expressed concern of permanent brain damage to T.S.. She denied drug or alcohol use and post-partum depression or sadness, saying that she was "so happy to have this baby."

Dr. Esernio-Jenssen also examined the baby, who was already in a leg cast. Aside from a small bruise on the right forehead, she noticed no other bruises. In the opinion and recommendation section of the report, she summarized the results of several diagnostic tests and images taken of the infant, and made her assessment:

> Head CT – (L) small subdural hemorrhage
>             (L) frontal fx     (R) parietal swelling
> Skeletal survey -- no frontal skull f[racture]
>             (R) femur fx --> acute (no callous)
> Head MRI -- No S[ub]D[ural] H[emorrhage] seen
> [unintelligible]: vitreous / retinal hemorrhage weeks old as per Dr. Kodsi
>
> Assessment:
> 9 wk old with acute femur fx, (L) frontal fx and vitreous / retinal hemorrhages with no plausible explanation, making inflicted cerebral trauma as etiology[12] for retinal hemorrhages fracture likely. Femur fx likely occurred while in care of [maternal grandmother].

(Exh. 1 to Rabin Decl., 6). The handwritten coversheet to the faxed report states that the infant was medically "cleared" and that "[f]emur fracture likely happened during the 3 hours with the grandmother." (Exh. 1 to Rabin Decl., 1). It also mentions "old and new retinal hemorrhage" along with a query: "?? who knows??" (*Id.*).

Based on this fax, Muhammad concluded that T.S. "had sustained a fracture[d] skull, a

---

[12]     The term *etiology* is a synonym for *cause.* Garner, Bryan, *Modern American Usage*, 315.

fractured femur as well as old and new retinal hemorrhage." (Exh. B at 1405). The internal ACS records for August 23, 2004 also describes T.S.'s family as "cooperative with the investigation," and having "an extended support system that is willing and able to provide any help needed." (Exh. B to Bowe Decl., 1375 & 1396).

### 4. Family Court proceedings

On August 24, 2004, Muhammad filed a petition in Family Court alleging child abuse by the respondents, V.S. and Ve.S., under New York Family Court Act § 1012. In the first addendum to the petition, she stated that T.S. was admitted to the hospital and diagnosed with "a. left frontal skull fracture, b. old and new retinal hemorrhages and c. right femur fracture." (Exh. C to Bowe Decl., 1330). T.S. is described as abused, neglected or is in imminent risk of so becoming because neither respondent could provide a plausible explanation for his injuries, which the hospital finds to be consistent with shaken baby syndrome. She adds that T.S. is believed to have been "shaken on more than one occasion". (*Id*.). The petition asks the child be removed to avoid imminent risk to his life or health. Later, Muhammad disclosed that when filing the petition she did not review the hospital records from LIJ, but relied on what she learned from her conversation with Dr. Esernio-Jenssen. (10/4/04 tr., Exh. 6 to Rabin Decl., 24).

That same day, the Family Court judge issued an order directing temporary removal of T.S. (56.1 Stmt ¶ 8; Exh. D to Bowe Decl.). The Family Court focused on the infant's "unexplained injuries including left frontal skull fracture" and the hospital personnel's belief that "the child has shaken baby syndrome." (*Id.*). The Court found that reasonable alternatives to removal were unavailing given the "imminent danger of risk to the infant." (*Id.*). A Family Court hearing that day dealt solely with the whether the child could be released from protective custody at the hospital. Ve.S. expressed her wish for the child to be reunited with his mother as soon it was medically possible, and indicated her willingness to leave her home and move to

another residence and to abide by any Family Court order. (8/24/04 tr., Exh. 2 to Rabin Decl., 12). The Family Court identified the biological father as a kinship source and accepted a paternity petition on his behalf.[13] On August 26, 2004, the Family Court paroled T.S. to the custody of his biological father.

At the next conference on September 23, 2004, the Family Court denied a motion by V.S. to return T.S. to her custody because V.S.'s attorney used the wrong motion form. (9/23/04 tr., Exh. 3 to Rabin Decl., 3). The motion was again denied on October 4, 2004, after a hearing that spanned several days. The Family Court Judge held that the child would face "imminent risk" if returned to his mother and ordered that he remain with the biological father. (56.1 Stmt ¶ 12). At the hearing, defendant Arthur testified that she spoke to one Dr. Shakin, a pediatric retinal specialist on September 28, 2004 who told her that the old and new vitreous hemorrhages on the surface of T.S.'s retina were the result of bleeding in the central cavity, which could be caused by shaken baby syndrome. From the different colored blood in the eye, he dated the injuries as old as "four to eight weeks" or as new as "two weeks." The different colored blood in the eye signifies that the baby was shaken at different times. (Exh. 6 to Rabin Decl., 28-30).

The Family Court trial against V.S. and Ve.S. began on January 31, 2005. (56.1 Stmt. ¶ 15). On May 12, 2005, Dr. Ram Kairam, chairman of pediatrics at the Bronx Lebanon Hospital and an expert witness in pediatrics, neonatal, perinatal medicine, and neurology, testified that the medical charts and images of T.S. from August 2004 do not support a diagnosis of shaken baby syndrome. (5/12/05 tr., Exh. 14 to Rabin Decl., 6, 13, 30). The shaken baby syndrome, he

---

[13]     At the trial, Muhammad made a home assessment of T.S.'s biological father who resided in Brooklyn and was directed by the Family Court as a kinship source. He had secured a crib and other essentials for the baby, and agreed to participate and complete a 14-week parenting program. He also agreed that if the child were placed in his care, any visit by the mother must be supervised. (Exh. B. to Bowe Decl., 1406).

explained, is a syndrome that consists of a cluster of "symptoms, signs and occurrences and findings" that must be present to support a diagnosis. (*Id*. at 30). He said the child was not coming from a history of mistreatment or neglect and did not have old injuries, so the injuries common to shaken baby syndrome were not present. (*Id*.). He explained that retinal hemorrhages could be induced by child birth, especially from difficulty of the infant's head passing through the birth canal. He found that T.S. infant's retinal hemorrhages could have been the result of child birth from a tall thin woman with a narrow pelvis. (*Id*. at 44).

After hearing testimony from various doctors, ACS withdrew the petition against the V.S. on October 17, 2005 and verbally amended the petition to proceed only against Ve.S. (*In re T*[.] *S*[.], No. NA-13963/04, Decision and Order, at 1, n.1 (Queens County Family Ct. Nov. 26, 2006), attached as Exh. G to Bowe Decl.). ACS filed an amended written petition on November 3, 2005 and resumed the trial in May 6, 2006. In a written decision dated, November 22, 2006, the Family Court judge found the grandmother was medically neglectful for failing to inform V.S. that T.S had suffered an injury.

### B.      Standard of review for summary judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. A genuine issue of material fact

exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), but must affirmatively "set out specific facts showing a genuine issue for trial," Fed. R. Civ. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).

Under Rule 56(f), "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." Fed. R. Civ. P. 56(f).

## C.     Discussion

### 1.     The reliability of Dr. Esernio-Jenssen

Defendants contend that they are entitled to deference for actions they took under urgent circumstances on August 20, 2004 to investigate the suspected abuse of T.S. The infant was reported to have suffered three injuries—a broken leg, retinal hemorrhages, and fractured skull— any of one which, they assert, could be a ground for a finding of child abuse.

The leg fracture was diagnosed by doctors at the emergency room, and V.S. was not suspected to be the cause of the injury because she was by all accounts not present when the injury occurred. *See In re Philip M.*, 82 N.Y.2d 238, 243 (1993) (to establish a prima facie case of abuse in Family Court, a petitioner has to demonstrate an injury of such nature as would ordinarily not occur absent an act or omission by respondents, and that respondents were the

child's caretakers at the time of the injury). Even ACS itself did not suspect V.S. of causing the leg fracture. As of August 20, 2004, ACS learned that the baby was apparently fine before V.S. left the home on August 19. When she returned home that day and noticed the leg swelling, she immediately attended to the injury, and brought the infant to the emergency room as soon as she realized the necessity of doing so. There was no evidence to suggest that she had reason to know how the injury occurred. It was the grandmother who gave inconsistent accounts of what had occurred while the infant was in her care for those three hours. However, by late August 20, 2004, even Ve.S. had disclosed that she had fallen with the infant while in the kitchen. The fall also may have caused the bruise on the infant's forehead. ACS had no basis upon which to suspect V.S. of abuse based upon the leg injury and the forehead bruise.

The other two injuries were diagnosed in Dr. Esernio-Jenssen's report, which she prepared after examining the infant, interviewing the mother and reviewing the diagnostic images. The more serious injury was the skull fracture. It was the injury Muhammad listed first in the petition and the one that the Family Court Judge specifically referenced in her removal order. Plaintiffs dispute that the report actually supports a finding of skull fracture. They point to the report's summary of the skeletal survey X-rays, which showed no fracture, and the cover sheet of the faxed report to ACS, which made no mention of the skull fracture, even though it is the most serious injury. The report's summary of the CT scan does note a skull fracture, as does the report's conclusion. There is mixed evidence of brain hemorrhage, which was supported by the CT scan but not by the MRI. The shaken baby syndrome was not listed in the report's findings or the conclusion.

Despite these ambiguities and contradictions, the report on its face may offer sufficient evidence for an ACS caseworker to conclude that the infant may have suffered the two head

trauma injuries, and to act on that information. There is, however, a question as to whether defendant Muhammad even read Dr. Esernio-Jenssen's report before filing her petition. She later testified that she did not review the medical records but relied only on her telephone conversations with Dr. Esernio-Jenssen. As a general matter, the court is inclined to defer to the pressing circumstances in which caseworkers sometimes operate, and finds that it could be reasonable for Muhammad to rely on telephone conversations with an examining physician, particularly in an especially egregious instance of abuse. Her reliance on a telephone conversation instead of reading the report might not be objectively unreasonable, although the better practice would have been to have considered all the available information.

However, plaintiffs have raised considerable doubts about the reliability of Dr. Esernio-Jenssen, especially concerning her inclination to find child abuse where none existed. This reputation, if true, would undermine the reliability of both the diagnoses in her report and what she conveyed over the telephone in a conversation that was not recorded. Plaintiffs complain that they have not had the opportunity to discover whether ACS caseworkers knew or should have known her reputation. The reliability of Dr. Esernio-Jenssen's diagnoses, as identified and discussed in the §§ I.C & III.B.3, *supra*, is an issue of material fact that goes directly to the objective reasonableness of ACS in seizing and removing T.S. from his mother.

ACS's attempt to show that the third injury, the retinal hemorrhage, could be established independently of Dr. Esernio-Jenssen is also unavailing based on the evidence contained in the partial Family Court record. At the October 4 hearing, Arthur testified using hearsay evidence permissible in Family Court proceedings, that she had learned from Dr. Shakin, that the retinal hemorrhages could be from two to eight weeks old. But she learned of these facts from Dr. Shakin by a telephone call on September 28, which is well after Muhammad filed the petition on

August 24.[14]

> **2. The continued prosecution of V.S. after probable cause had allegedly dissipated.**

Plaintiffs also contend that, even if ACS initially had probable cause to remove the infant from V.S. and initiate proceedings in Family Court against her, they still violated her constitutional rights by pressing the case when they no longer had reasonable cause to do so. As set forth in § III.D, *supra*, the court has held that a valid malicious prosecution claim under Section 1983 must establish that a deprivation of the plaintiff's Fourth Amendment rights. In this case, as in the matter of Denes Q., the parent plaintiffs' Fourth Amendment rights were not violated and she cannot vicariously assert T.S.'s rights. The Section 1983 malicious prosecution claim (Count III) therefore is dismissed. Nonetheless, the malicious prosecution claim under state law (Count IV) remains viable.

A malicious prosecution claim can rest on a prosecution that was continued after discovery of information that exculpates the defendant. *Kinzer v. Jackson*, 316 F.3d 139, 144-145 (2d Cir. 2003). Under New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause. *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996). In order for probable cause to dissipate, the groundless nature of the charge must be made apparent by the discovery of some intervening fact.

---

[14]     The City defendants point out that Dr. Shakin, a non-defendant, testified in Family Court on January 25, 2005 that he firmly believed that the infant had suffered from the shaken baby syndrome. (Defts' Reply 56.1 stmt. (07cv213 ECF Dkt. Entry No. 44) ¶ 63; 1/25/05 tr., Exh. 9 to Rabin Decl., 73). From the partial transcript of his testimony provided to this court, he apparently examined the infant at the request of Dr. Esernio-Jenssen, and may have shared his findings with her. (Exh. 9 to Rabin Decl., 35). The City defendants have not put forth any evidence that Dr. Shakin had independently informed ACS of his diagnosis prior to their decision to remove the infant and to prosecute V.S. So far as the court can tell from the record, ACS relied entirely on the shaken baby syndrome diagnosis made by Dr. Esernio-Jenssen as the basis for their course of action. Hence, the reasonableness of their conduct still turns on their ability to rely on Dr. Esernio-Jenssen.

*Id.* The New York Court of Appeals has held that "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983).

Plaintiffs contend that by early 2005, ACS should have ruled out V.S. as the cause of any of T.S.'s suspected injuries. In a sworn affidavit, V.S. states that in January 2005, defendant Muhammad, on a visit to her new apartment, told her that she no longer believed T.S. had been shaken or that V.S. caused any injury to him. (V.S. Decl. ¶ 19). In May 2005, another ACS caseworker, Debra Sankarsingh, shared the same belief with V.S. and revealed that she did not know why the case was still pursued against her. (*Id.* ¶ 20). In late June 2005, Sankarsingh told V.S. and her parents that the agency intended to withdraw the case against V.S. at the next court appearance. (*Id.* ¶ 21). But at the next Family Court appearance on June 30, 2005, the case continued against V.S., and Muhammad and Sankarsingh allegedly told her that they had been warned by ACS counsel not to withdraw the petition. Thus, the case continued against V.S. until October 2005, extending her separation from T.S. by another three and half months. Based on these allegations, plaintiffs are entitled to deposition discovery on the issue of whether the prosecution against her in Family Court was continued after probable cause had dissipated. Furthermore, these allegations raise an inference of bad faith by the City defendants, which if true, would extinguish their entitlement to qualified immunity. The allegations also create an inference of an improper purpose behind the prosecution which sustains plaintiffs' abuse of process claim.

The City defendants argue that plaintiffs' continued malicious prosecution claim is barred by the Rooker-Feldman Doctrine, because the Family Court had denied V.S.'s application to restore T.S. to her custody, and, in so doing, had sustained ACS's probable cause against V.S.

The Family Court's denial of V.S.'s remand application was decided on the merits on October 4, 2004, but plaintiffs claim that the probable cause against her dissipated thereafter. No further rulings were made against V.S. because the ACS petition against her was withdrawn, in the words of the Family Court "after medical testimony" in the trial. The Rooker-Feldman Doctrine is unavailing.

### 3. City defendants' assertion of absolute immunity

As an alternative to their qualified immunity defense, the City defendants claim that they are also entitled to absolute immunity as to their preparation for and participation in the initiation of child custody protective proceedings. They contend that their investigation and submission of an affidavit in support of the Family Court petition were made in the context of a judicial proceeding that was prosecutorial in nature, which should accord them absolute immunity enjoyed by prosecutors. To the extent that absolute immunity is asserted against the Section 1983 malicious prosecution claim, the defense is moot for the claim is dismissed. As set forth below, to the extent absolute immunity is being asserted against any other Section 1983 or state law claim, the defense is not available to the City defendants, who acted not as prosecutors but as complaining witnesses.

### a. Absolute immunity under federal law

As a general matter, Section 1983 respects the absolute immunity enjoyed by judges at common law. *Pierson v. Ray*, 386 U.S. 547, 553-55 (1967). Absolute judicial immunity is extended to criminal prosecutors in connection with prosecutorial functions "intimately associated" with the judicial process. *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). This is to ensure that harassment from unfounded litigation would not deflect the prosecutors' energies from their public duties and would not shade their decisions, as they are required by the public trust to exercise independent judgment. *Id*. at 422-423. The *Imbler* decision did not consider

whether such immunity would be available for "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate" *Id*. at 430-31.   Subsequently, the U.S. Supreme Court, in no uncertain terms, held that when a prosecutor assumes the function of a "complaining witness" by signing an affidavit attesting to the facts supporting the issuance of a warrant, his actions are not prosecutorial in the traditional sense, and are not protected by absolute immunity from Section 1983 actions.   *Malley v. Briggs*, 475 U.S. 335, 340-341 (1986); *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997)(holding unanimously that a prosecutor may be held liable under Section 1983 for conduct in obtaining an arrest warrant).   In support of its holding, the Court looked to the statutory origins of Section 1983, which was enacted as Section 1 of the Civil Rights Act of 1871.   The common law of that era did not grant complaining witnesses absolute immunity.   The Court then analogized a complaining witness to a modern day police officer who also cannot claim absolute immunity for securing a warrant without probable cause. *Kalina*, 522 U.S. at 505-06.

In this case, defendant Muhammad helped prepare the petition against V.S. in Family Court for the removal of her children and signed an affidavit which provided the factual basis for the petition.   In so doing, she acted as a complaining witness.   In the Second Circuit, "[t]he investigation of charges of child abuse and the removal of a child from its parents' custody is accorded only qualified protection."   *Robison v. Via*, 821 F.2d 913, 919-20 (2d Cir. 1987).[15]   In

---

[15]      The City defendants cite a number of cases from other circuits that have conferred absolute immunity upon child welfare workers who initiate and testify in child welfare proceedings. *See Ernst v. Children & Youth Servs. of Chester County*, 108 F.3d 486, 495 (3d Cir. 1997); *Thompson v. SCAN Volunteer Services*, 85 F.3d 1365, 1373 (8th Cir. 1996); *Milpaugh v. County Dep't of Pub. Welfare*, 937 F.2d 1172 (7th Cir. 1991).   These cases were all decided prior to *Kalina*.   More recently, the Ninth Circuit issued an *en banc* decision overruling precedent that had extended absolute immunity to actions taken in "connection with" and "incident to" ongoing child dependency proceedings. *See Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003)(en banc).

*Robison*, the court gave three reasons for recognizing limited immunity: (1) the investigative activities were not "intimately associated with the judicial [process]"; (2) the absence of any comparable immunity at common law and of any "compelling policy considerations"; and (3) society's need to check the enormous authority that child welfare officials wield over children and families through qualified instead of absolute immunity. *Id.* The second and third reasons are especially pertinent to the circumstances of this case.[16]

Therefore, consistent with the Supreme Court's general guidance in *Kalina* and the Second Circuit's specific reasoning in *Robison*, the court finds that the City defendants, as non-attorney state employees of ACS, are not entitled to absolute immunity from Section 1983 liability.

### b.     Absolute immunity under state law

New York law provides absolute immunity to judges and "other neutrally positioned government officials, regardless of title, who are delegated judicial or quasi-judicial functions [and] should . . . not be shackled with fear of civil retribution for their acts." *Moshe-Simons v. County of Allegany*, 99 N.Y.2d 214, 220-221 (2002). In *Moshe-Simons*, the New York Court of Appeals specifically held that child welfare caseworkers who carried out a home-study report pursuant to an order of the Family Court had functioned as an arm of the court and were

---

The U.S. Supreme Court has not directly decided whether child welfare workers are entitled to absolute immunity in Section 1983 actions arising from their child protection activities, but Justice Thomas has expressed skepticism toward claims for such immunity. *See Hoffman v. Harris*, 511 U.S. 1060, 1062-63 (1994) (Thomas, J., dissenting from denial of certiorari, questioning whether a social worker seeking absolute immunity from Section 1983 claims could demonstrate that the privilege was recognized at common law in 1871.).

[16]     The Second Circuit had previously held that attorneys who represent child welfare workers were entitled to absolute immunity for child advocacy work, but plaintiffs here have not named any ACS attorneys as defendants. *Walden v. Wishengrad*, 745 F.2d 149, 152 (2d Cir. 1984).

therefore entitled to absolute immunity against a negligent home-placement claim. The "extension of judicial immunity to those [defendants] whose actions are an integral part of the judicial process is limited . . . to claims arising from the performance of specific judicially delegated function." 99 N.Y.2d at 220. The City defendants in preparing and filing the petition in Family Court carried out no such judicial function.

One recent appellate division opinion, held in conclusory fashion, that ACS's investigation and removal of a plaintiff's child, which resulted in the filing of a Family Court petition, were quasi-judicial acts that are entitled to absolute immunity. *Carossia v. City of New York*, 39 A.D.3d 429, 430 (1st Dep't 2007); *see also Arteaga v. State of New York*, 72 N.Y.2d 212, 216 (1988)(finding absolute immunity appropriate when a defendant's conduct "involves the conscious exercise of discretion of a judicial or quasi-judicial nature"). However, even prosecutors who are afforded absolute immunity for actions undertaken in their quasi-judicial role of prosecuting crimes, have only qualified immunity for actions that are investigative or administrative in nature. *Claude H. v. County of Oneida*, 214 A.D.2d 964, 965 (4th Dep't 1995); *Rodrigues v. City of New York*, 193 A.D.2d 79, 87 (1st Dep't 1993); *Cunningham v. State*, 71 A.D.2d 181, 183 (2d Dep't 1979). Other appellate division cases have limited absolute immunity to the attorneys of child welfare agencies. *See e.g.*, *Donovan v. City of New York*, 15 A.D.3d 219, 220 (1st Dep't 2005). The ACS caseworker defendants in this case, none of whom are attorneys, acted as complaining witnesses in investigating a suspected case of child abuse and preparing a Family Court petition. Defendant Muhammad allegedly lacked even the discretion to discontinue the Family Court proceeding without approval from ACS counsel. The City defendants have not shown that their actions carried out a judicially-delegated function or were quasi-judicial in nature such that they are entitled to any protection beyond qualified immunity.

### 4.     Involvement of Commissioner Mattingly

The City defendants also contend that plaintiffs' Section 1983 claims against Commissioner Mattingly should be dismissed for lack of evidence that he was personally involved in the alleged constitutional violation.  A valid Section 1983 claim against a defendant acting in a supervisory capacity must assert that he "(1) [had] actual direct participation in the constitutional violation, (2) fail[ed] to remedy a wrong after being informed through a report or appeal, (3) creat[ed] a policy or custom that sanctioned conduct amounting to a constitutional violation or allow[ed] such a policy or custom to continue, (4) [was] grossly negligent [in the] supervision of subordinates who committed a violation, or (5) fail[ed] to act on information indicating that unconstitutional acts were occurring."  *Hernandez v. Keane*, 341 F.3d 137, 144-145 (2d Cir. 2003).  The bare fact that an individual occupies a high position in a defendant's institution's hierarchy does not suffice to sustain a claim.  *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995).

In this case, the allegations in the complaint and other cases of which the court has taken judicial notice in this opinion make it plausible to believe that ACS followed a custom of relying on the child abuse diagnoses by Dr. Esernio-Jenssen, when such reliance may have been unwarranted and may have contributed to the violations of plaintiffs' constitutional rights in this case and others.  Furthermore, it is plausible that Commissioner Mattingly may have been or should have been aware of this custom, given the apparent frequency with which the agency has relied on Dr. Esernio-Jenssen's opinions, both prior to the initiation of and during Family Court proceedings, and the severity of the consequences that has resulted from such reliance. Therefore, the court declines to dismiss the claims against Commissioner Mattingly at this junction of the litigation.

## V.      Conclusion

For the foregoing reasons, defendants' motions pursuant to Rules 12(b)(6), 12(c) and 56 are granted as to plaintiffs' malicious prosecution claims under Section 1983.  The City defendants' Rule 12(c) motion in the Denes Q. matter is also granted as to plaintiffs' abuse of process claim.  The motions are denied as to all other claims.

The parties in both cases shall proceed with discovery.  Both cases are referred to the Hon. James Orenstein, U.S.M.J., for further proceedings consistent with this opinion.


SO ORDERED.

Dated: Brooklyn, New York
           September 30, 2008

_____/s/_____
DORA L. IRIZARRY
United States District Judge