FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 22 2011 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
V.S., individually and on behalf of her
minor child, T.S.,

                     Plaintiffs,

   -against-

NADIRA MUHAMMAD et al.,

                  Defendants.
-------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
07-CV-213 (CBA) (JO)

AMON, Chief United States District Judge:

      V.S., suing individually and on behalf of her son T.S., seeks to hold the defendants in this case liable under the U.S. Constitution and laws of New York for their actions in connection with the treatment of T.S. and the related prosecution of V.S. for child abuse.

      The defendants who remain in this suit, private health care providers and a private physician (the medical defendants) as well as the City of New York (the City), have moved for summary judgment.

      The Court grants the medical defendants' motion for summary judgment on the constitutional claims and declines to exercise jurisdiction over the state law claims. The City's motion for summary judgment is granted in its entirety.

## BACKGROUND

### I. Pre Hospital

      On the afternoon of August 19, 2004, from about 2:00 p.m. to 5:00 p.m., V.S. left her then nine-week old son with her mother (with whom they both lived) in Queens while she traveled to Manhattan for an appointment. (Pl. R. 56.1 ¶ 4.)

Sometime around 7:00 p.m., after she had returned from Manhattan, V.S. noticed a "red mark" on T.S.'s right thigh.  (V.S. Dep. 34–35.)  Although T.S. was not crying when V.S. returned to Queens, he was unusually irritable.  (Id. at 35.)

When V.S. asked her mother about T.S.'s behavior, her mother, Ve.S., suggested that T.S. was "gassy."  (Id. at 36.)  When V.S. asked her mother about the red mark on T.S.'s thigh—which she did immediately after noticing the mark and then at least ten times thereafter—Ve.S. said that she did not know anything about it and suggested that it might be a bug bite.  (Id. at 37–39.)

Within a few hours of noticing the mark, and after T.S.'s leg began to swell, V.S. decided, after speaking on the telephone with T.S.'s pediatrician, to take her son to the emergency room.  (Id. at 39.)  V.S.'s father—who also lived with V.S., Ve.S., and T.S. in Queens—drove the group to Schneider Children's Hospital.  (Id. at 39–41.)  Schneider is a private hospital and is owned and operated by Long Island Jewish Medical Center, which is a defendant in this action.

During the approximately forty five minute drive to Schneider, V.S. continued to ask her mother about T.S.'s injury.  Ve.S. eventually said that she may have brushed T.S. against the cabinet or counter in the kitchen while V.S. was in Manhattan.  (Id. at 42.)

**II. Hospital**

V.S. arrived with T.S. at the emergency room at Schneider at about 11:55 p.m.  (Pl. R. 56.1 ¶ 10.)  Soon after arrival, at about 1:00 a.m. on August 20, 2004, T.S. was examined by an emergency room doctor, Cathy Kumar, M.D., who diagnosed a right femur fracture as well as a small bruise on T.S.'s forehead.  (Med. Def. Ex. B 100098–99.)  When asked during this

examination, V.S. could not explain the injuries and Ve.S., who said she was unaware of any major trauma, stated only that she brushed T.S. against the counter earlier that day. (Id.)

After her examination of T.S. and her interviews of V.S. and Ve.S., Dr. Kumar, pursuant to her duties as a mandated reporter under New York law, filed a report of suspected child abuse with the New York State Central Registry. (Med. Def. Ex. B 100096.) In that report, Dr. Kumar noted the femur fracture and her belief that the story as to how the fracture might have occurred—the brush against the counter or cabinet—was inconsistent with the diagnosed injury. (Id.) The written report listed as "adults responsible and alleged subjects" V.S., Ve.S., V.S.'s father, and the father of T.S. (Id.)

Sometime after Dr. Kumar examined T.S., another Schneider doctor examined the child and noted a small bruise to T.S.'s forehead and swelling in his right leg. (Med. Def. Ex. B. 100100.) The examining doctor recommended several tests, including an x-ray of the right femur, a head CT scan, a skeletal survey, and an ophthalmology exam. (Id.) The doctor also recommended that T.S. be admitted ("admit / observation") to Schneider. (Id.) The doctor further recommended calling Debra Esernio-Jenssen, M.D., a child abuse specialist who was the head of the Child Protection Team at Schneider. (Id.)

Also sometime after Dr. Kumar examined T.S., Schneider doctors ordered a head CT scan and a full blood work up. (Pl. R. 56.1 ¶ 16.) The head CT scan was conducted early on the morning of August 20, 2004, at about 4:30 a.m., by Dr. Lewis, a radiologist. (Med. Def. Ex. B 100094.) Dr. Lewis's notes indicate that the CT scan showed a "left frontal questionable [unintelligible] subdural hematoma with overlying non-displaced fracture." (Id.)

A doctor at Schneider then ordered a neurology consultation, listing the reasons for the consultation as T.S.'s frontal sub-acute subdural hematoma and left frontal non-displaced skull

fracture. (Med. Def. Ex. B 100097.)  The neurologist diagnosed T.S. as the victim of child abuse, "(suspected) until proven otherwise." (Id.)  The neurologist also recommended that a full skeletal survey and an ophthalmology examination be conducted. (Id.)

At about 7:30 a.m., a pediatric orthopedist examined T.S. and confirmed that he had a fractured right femur. (Med. Def. Ex. B 100124.).  The orthopedist recommended, among other things, splint immobilization, "CPS evaluation," and Tylenol for pain. (Id.)

At about 7:50 a.m., a Dr. Wells contacted Dr. Jenssen and told her about T.S. (Med. Def. Ex. B 100172.)  She said that T.S. had a right femur fracture, left frontal skull fracture, and a left subdural hematoma. (Id.)

Sometime after she was contacted, Dr. Jenssen ordered an ophthalmology examination for T.S. That exam, which was conducted at about 11:00 a.m., identified old blood in the far periphery of T.S.'s eyes. (Med. Def. Ex. B 100177.)  The doctor performing the exam, Sylvia Kodsi, M.D., noted that T.S. had retinal hemorrhages and other signs of non-accidental trauma (presumably the femur and skull fractures and the subdural hematoma) and that "all this is consistent with shaken baby syndrome." (Id.)

At about 3:00 p.m. that afternoon, someone at Schneider made a second report to the State Central Registry. (Med. Def. Ex. B 100120.)  The report stated that, since the first report, T.S. had undergone additional testing and that the testing revealed "new findings" of a non-displaced frontal fracture and "old and new retinal bleeding suggestive of shaken baby syndrome." (Id.)  The second report listed as "adults responsible and alleged subjects" V.S., Ve.S., and V.S.'s father. (Id.)

Sometime after the first report of suspected child abuse was filed, the New York Administration for Children's Services (ACS) began its investigation of T.S.'s case. On the

4

evening of August 20, 2004 ACS caseworker Nadira Muhammad, a defendant in this case, arrived at Schneider.  When she arrived, she met with Dr. Jenssen, who explained to her T.S.'s injuries, including that, according to Muhammad's testimony, T.S. had a broken femur and "may have shaken baby syndrome" and "a possible skull fracture."  (Muhammad Dep. 31.)

Shortly after Muhammad's arrival, she and Dr. Jenssen and another ACS caseworker met with V.S.  Dr. Jenssen did "all the talking" and explained to V.S. the injuries that T.S. had suffered.  (Id. at 33.)  Dr. Jenssen urged V.S. to explain what had happened to T.S. that might have caused his injuries.  (Id.)  V.S. explained what she had done the previous day and said that she did not know what had happened to her son.  (Id. at 33–34.)

Also sometime on the evening of August 20, 2004, T.S.'s grandmother, Ve.S., met with detectives from the New York City Police Department's Special Victims Unit.  At that meeting, which occurred at Ve.S.'s house, Ve.S. told the detectives that she had fallen while holding T.S. sometime during the afternoon of August 19.  (Pl. R. 56.1 ¶ 32; Med. Def. Ex. B 100134.)  She stated that she had hit her head on the countertop or cabinet during the fall and the detectives observed that Ve.S. had a large hematoma that had spread over her eyelid.  (Med. Def. Ex. B 100134.)  Ve.S. showed the detectives the area in the kitchen where she had fallen and re-enacted the fall; the detectives believed that, based on the dimensions and layout of the kitchen, her story was plausible.  (Id.)

In notes that she prepared upon learning of the detectives' meeting with Ve.S., Dr. Jenssen wrote that Ve.S.'s fall in the kitchen, as she described it, could explain T.S.'s fractured femur.  (Id.)  Her notes also state that an MRI revealed that the subdural hematoma shown on the head CT scan was, in fact, not a hemorrhage.  (Id.)  Those same notes state that, "in view of new information," Dr. Jenssen was ordering an ophthalmologist, Eric Shakin, M.D., to conduct a

second retinal examination; the doctor who had performed the original examination, Dr. Kodsi, was away on vacation. (Id.)

The next day, August 21, 2004, T.S. continued to receive medical attention, including from pediatric services and a neurosurgeon. (Pl. R. 56.1 ¶ 41.) Also on that date, T.S. was awaiting a consultation from ophthalmology and from a pediatric cardiologist, apparently for a heart murmur that had been diagnosed. (Id. ¶ 42.)

Dr. Shakin, the ophthalmologist, examined T.S. the next day, August 22, 2004. (Id. ¶ 43.) He testified in state family court proceedings that he understood that he was being asked to examine T.S. "to look at the etiology of the hemorrhages and . . . to see if it was possibly consistent with shaken baby syndrome." (City Def. Ex. D, Jan. 31, 2005 Tr. 63.) Dr. Jenssen's notes indicate that Dr. Shakin identified old and new retinal bleeds, some of which were about two to three weeks old. (Def. Ex. B 100142.) These findings were "consistent with shaken baby syndrome" and "not related to birth trauma." (Id.)

Dr. Jenssen's notes also indicate that V.S.'s obstetrician-gynecologist would contact her on August 23, 2004 to discuss V.S.'s delivery of T.S. (Id.) Those notes also state that Dr. Jenssen spoke with the obstetrician-gynecologist's partner, who informed Dr. Jenssen that she recalled that the "delivery was uneventful." (Id.)

Medical treatment of T.S. continued. On August 23, 2004, his right femur was evaluated by a pediatric orthopedist. (Pl. R. 56.1 ¶45.) The next day he was evaluated by a pediatric cardiologist for a heart murmur. (Id. ¶ 46.)

Two things happened on August 24, 2004. (Id. ¶ 48.) First, according to an entry in T.S.'s chart, dated 1:40 p.m., T.S. was "medically cleared for discharge" and, also according to the chart, was being held at Schneider "awaiting ACS disposition." (Med. Def. Ex. B 100149.)

Second, ACS filed a removal petition in New York family court.  That petition, which was sworn

to by Muhammad, states that "upon information and belief" V.S. and Ve.S. "are the person's

[sic] who are responsible for the abuse and neglect" of T.S.  (Med. Def. Ex. F.)

On August 24, 2004, at about 2:00 p.m., the family court held a hearing at which V.S.

and Ve.S. were present, represented by counsel, to address the removal order.  (Med. Def. Ex.

K.)  At that hearing, there was discussion of remanding T.S. to the custody of his purported

father, but that could not be done until the purported father established paternity.

There was also discussion of the fact that Ve.S. may have made some "admissions" about

T.S.'s injuries and that she was willing to travel to a house that she maintained upstate so that

T.S. could return to his home in Queens with his mother.  (Id.)  The parties ultimately agreed to

put the hearing over for two days and the family court remanded T.S. to the custody of ACS in

the interim.  (Id.)

### III. Discharge

From August 24, 2004 to August 26, 2004, T.S. stayed at Schneider.  (Pl. R. 56.1 ¶ 72.)

During that period, ACS made arrangements for T.S.'s discharge, including evaluating the house

of T.S.'s father and reviewing a paternity petition.  (Id. ¶ 74.)  On August 26, 2004, sometime

before 5:30 p.m., the family court ordered T.S. into the custody of his father and Schneider

discharged T.S. pursuant to that order.  (Id. ¶ 78.)

After T.S.'s discharge, Dr. Jenssen, on September 16, 2004, told ACS staff that she did

not believe that V.S. had injured T.S. and in fact could not imagine V.S. hurting her child.

(Supp. Bowe Decl. Ex. CC 13.)  She said that she believed that Ve.S. had injured T.S. and

indicated that she would testify to that in court.  (Id.)

V.S. moved in the family court to vacate the removal order and the family court held a hearing on September 27 and 29, 2004. (Bowe Decl. Exs.) None of the ACS caseworkers who testified at that hearing—and testified against V.S. and in favor of maintaining the removal order—mentioned Dr. Jenssen's belief that V.S. was not a danger to her child, and the family court refused to vacate the removal order. (Id.)

On October 12, 2004, pursuant to state law, ACS notified the Central Register of the result of its completed investigation. It stated that it had not substantiated the charges against V.S. but had substantiated abuse charges against Ve.S. (Zuccardy Decl. Ex. 2.) V.S. subsequently again sought to reopen and vacate the removal order but the family court, at the urging of the City, refused to reopen the proceedings. (Pl. R. 56.1 ¶ 84; Zuccardy Decl. Ex. 5.)

The City continued to prosecute V.S. and Ve.S. for child abuse and a trial in family court began on January 24, 2005. (Bowe Decl. Exs.) At trial, Dr. Shakin testified about the hemorrhages he had observed in T.S.'s eyes and his diagnosis of shaken baby syndrome. (Id.) Dr. Jenssen also testified and adhered to her diagnosis of shaken baby syndrome. The City rested its case on May 9, 2005.

On May 10, 2005, V.S. presented her case, calling a neurologist who testified that T.S. had not had a subdural hematoma or skull fracture. He testified that doctors at Schneider had misread the head CT scan, which, in the neurologist's opinion, did not show any abnormalities at all. V.S. also offered the expert testimony of a pediatrician who opined that T.S. was not a victim of shaken baby syndrome. He opined that T.S.'s retinal hemorrhages were not of the sort usually observed in shaken babies and that they were most likely explained by T.S.'s difficult birth.

Five months later, for reasons that remain unclear, the City terminated its prosecution of V.S. and released T.S. to the custody of his mother. The City subsequently amended its abuse petition to name only Ve.S. and continued to prosecute that case. In November 2006, the family court found that Ve.S. had fallen while holding T.S. and caused him to break his femur.

## IV. Litigation

The plaintiffs filed this lawsuit in January 2007 against both the medical and City defendants.

The plaintiffs alleged that the medical defendants violated their constitutional rights when they detained T.S. without cause or process, and subjected him to a skeletal survey and MRI exam without process. They pleaded claims under state law about the same acts and also about the medical defendants' actions in connection with the investigation and prosecution of V.S. in family court. The plaintiffs pleaded similar claims against the City defendants; the essence of many of those claims was that the City defendants acted unreasonably in relying on Dr. Jenssen for evidence of child abuse because she has a history of inaccurate and misleading diagnoses of abuse.

The medical defendants eventually moved to dismiss (asserting, among other things, absolute and qualified immunity) and the City defendants moved for summary judgment. The district court denied the motions in the main, granting the defendants relief only with respect to the malicious prosecution claims that were asserted under 42 U.S.C. § 1983. V.S. v. Muhammad, 581 F. Supp. 2d 365 (E.D.N.Y. 2008) (Irizarry, J.).

The individual City defendants subsequently appealed the denial of immunity and the Second Circuit awarded a judgment in their favor on the state law and constitutional claims.

V.S. v. Muhammad, 595 F.3d 426 (2d Cir. 2010). As the Court explains later, the substance of the Second Circuit's opinion with respect to the constitutional claims is contested.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) (internal quotation marks omitted).

The movant bears the burden of establishing that no genuine issue of material fact exists. Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). The court "must resolve all ambiguities and draw all reasonable inferences against the movant." Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 117 (2d Cir. 2010). "To survive summary judgment the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Niagara Mohawk Power Corp. v. Jones Chem. Inc., 315 F.3d 171, 175 (2d Cir. 2003) (internal quotation marks and emphasis omitted). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998). Moreover, "the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion." Powell v. Nat'l Bd. of Med. Examiners, 364 F.3d 79, 84 (2d Cir. 2004).

## II. Medical Defendants: Unconstitutional Detention

The plaintiffs claim that the medical defendants unconstitutionally held T.S. at Schneider "on the grounds of suspected child abuse" as state actors without adequate justification and without providing adequate process. (Pl. Br. at 23–26.)

Resolution of the plaintiffs' claims about detention requires the Court to ask and answer two questions. First, did the medical defendants detain T.S. as state actors at any point? Second, did any state detention violate the plaintiffs' federal constitutional rights?

### A. State Action

The federal statute under which the plaintiffs have asserted their constitutional claims, 42 U.S.C. § 1983, "imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" K & A Radiologic Tech. Servs., Inc. v. Comm'r of Dep't of Health, 189 F.3d 273, 280 (2d Cir. 1999) (quoting Blessing v. Freestone, 520 U.S. 329, 340 (1997)).

As the Second Circuit has explained, "the core purpose of § 1983 is 'to provide compensatory relief to those deprived of their federal rights by state actors.'" Hardy v. New York City Health & Hosps. Corp., 164 F.3d 789, 795 (2d Cir. 1999) (quoting Felder v. Casey, 487 U.S. 131, 141 (1988)). Consequently, the Court's "first inquiry . . . is whether the actions alleged by the plaintiffs come within the definition of under color of state law." Kia P. v. McIntyre, 235 F.3d 749, 755 (2d Cir. 2000) (internal quotation marks and bracket omitted).

Although the plaintiffs' papers are not entirely clear, at oral argument they clarified that they allege that the medical defendants detained T.S. as state actors from August 20, 2004 until August 26, 2004. The medical defendants answer that they can be deemed state actors only from August 24, 2004 to August 26, 2004 because T.S was properly admitted and then "received

11

medical treatment from August 19, 2004 through August 24, 2004 and was not medically cleared for discharge until August 24, 2004." (Med. Def. Br. 7.)

The parties have discussed several cases applying several tests aimed at determining whether private actors can be held liable in several settings under the Constitution as state actors, but the Second Circuit's opinion in Kia P. v. McIntyre provides the rule of decision in this case. In Kia P., the plaintiffs—a mother and her infant child—sought to hold a private hospital liable for detaining the child, Mora, when, shortly after her birth, her urine tested positive for methadone. Id. at 751–52. There, the Second Circuit held that the private hospital detained Mora both as a state actor and also as a private actor. The hospital held her as a private actor when it detained her "between the receipt of the results of the first [urine] test and Mora's ultimate medical clearance eight or nine days later" after a subsequent test revealed that her urine was free of methadone. Id. at 753. This detention was "for medical reasons" because "it was the medical staff that made the initial decision to withhold Mora's release because of the danger of methadone withdrawal" and "from Mora's birth to her medical release, the infant was under medical observation and care by the Hospital's medical staff." Id. at 753, 756.

With respect to detention as a state actor, the Second Circuit explained that, "insofar as the Hospital was acting . . . as part of the reporting and enforcement machinery for CWA [the Child Welfare Administration, an ACS predecessor], a government agency charged with detection and prevention of child abuse and neglect . . . the Hospital was a state actor." Id. at 756. In Kia P. the Second Circuit concluded that the private hospital held Mora as part of the reporting and enforcement machinery of the state, since the infant child was detained pursuant to "compliance with Hospital and CWA policies requiring that any child under investigation by CWA not be released from the Hospital without CWA permission." Id. at 752–53, 756–57; see

12

also Estiverne v. Esernio-Jenssen, 581 F. Supp. 2d 335, 343–44 (E.D.N.Y. 2008) (discussing this holding of Kia P.).

Turning to the question of liability for Mora's detention, the Second Circuit concluded that, where the private hospital held Mora as both a private actor and a state actor, the hospital could not be constitutionally liable for Mora's detention.  The court explained that where the state and private detentions overlapped, "the Hospital in its role as state actor . . . was incapable of depriving, and therefore did not deprive, mother and daughter of liberties that had already been taken away by the Hospital's medical staff as private, professional persons."  Kia P., 235 F.3d at 757.  Only when Mora was medically cleared by hospital doctors did Mora's deprivation become the consequence of state action, which exposed the hospital to liability under the Constitution.

Applying the teaching of Kia P. to this case, the Court concludes that the only reasonable view of the evidence is that, from the time that T.S. arrived at Schneider until the time of his medical clearance, T.S. was held "for medical reasons" and "under medical observation and care" by medical staff.  Id. at 753.  From after August 24, 2004 at about 1:40 p.m. to August 26, 2004 at about 5:30 p.m., the medical defendants were state actors capable of violating the plaintiffs' constitutional rights.

The plaintiffs do not appear to dispute that T.S. was admitted to Schneider for observation and treatment of his femur fracture and what doctors initially believed to be a skull fracture.  They do, however, contend that T.S. was "medically ready for discharge" before August 24, 2004.  They note that T.S.'s femur fracture was properly treated so that discharge was appropriate within two days of his admission, as orthopedics declared him stable and ready for release on August 23, 2004.  (Med. Def. Ex. B 100142, 100144.)  They argue that "none of the

13

other injuries which the medical defendants claimed T.S. had required treatment." (Pl. Br. at 23–24.)

The evidence, viewed in the light most favorable to the plaintiffs, does not support the conclusion that T.S. was held solely for ACS-related purposes from about August 22, 2004 to August 24, 2004. After admission, T.S. was examined and treated by no fewer than four doctors, including a neurologist, pediatric cardiologist, and a pediatric orthopedist. Relevant here, T.S. was examined as late as August 23, 2004 by a pediatric orthopedist and as late as August 24, 2004, the day of discharge, by a pediatric cardiologist. The plaintiffs have identified no evidence to support the claim that the medical defendants delayed formal medical clearance by a day because of ACS-related concerns and not because of their medical judgment that T.S. warranted in-patient care.

The fact that T.S.'s continued presence at Schneider (after orthopedic clearance) may not have been an absolute medical necessity is not sufficient, in view of the other evidence in the record, to permit the finding that T.S. would not have been detained until formal medical clearance absent ACS concerns. See id. at 756 n.2 (fact that "[s]ome evidence suggests that if the Hospital does not have concerns relating to the ability of a parent properly to care for an infant, there may be circumstances when, at least absent further action by the Hospital, that parent may take the child home despite 'medical advice' to the contrary . . . does not establish that absent CWA-related concerns, Mora would have been released to her mother").

In sum, a reasonable jury could find that T.S. was detained by the medical defendants as state actors from August 24, 2004 at about 1:40 p.m. until August 26, 2004 sometime before 5:30 p.m. The question, then, is whether that detention was consistent with the plaintiffs' substantive and procedural constitutional rights.

14

**B. Substantive Due Process**

The plaintiffs claim that, "even assuming that the seizure and detention did not occur until August 24, 2004, the medical defendants' actions violated the Constitution" because they held T.S. without "probable cause for keeping T.S. in their custody." (Pl. Br. at 24). The court considers this an argument about substantive due process.[1]

The medical defendants answer principally that they acted upon a reasonable basis in detaining T.S. from August 24, 2006, as they "awaited further instructions from ACS," which was seeking removal in family court and then evaluating T.S.'s father for post-discharge placement. (Med. Def. Br. at 31–33.)

It is well settled that V.S. has a fundamental liberty interest in maintaining custody of her child without state interference. See, e.g., Wilkinson v. Russell, 182 F.3d 89, 103 (2d Cir. 1999) ("It has long been settled in this Circuit that a parent's interest in the custody of a child is a constitutionally protected liberty interest subject to due process protection." (internal quotation marks and brackets omitted)); Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996).

Consequently, absent a sufficiently compelling justification, the state may not have separated V.S. from her son. See Tenenbaum, 193 F.3d at 600 (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)); Velez v. Reynolds, 325 F. Supp. 2d 293, 303 (S.D.N.Y. 2004) ("Substantive due process protects individuals from arbitrary government intrusions by requiring a reasonable basis or justification for such action.").

Relevant here, the Second Circuit has recognized one such justification to be the "governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." Wilkinson, 182 F.3d

---

[1] This is a claim that belongs only to V.S., not T.S., whose challenge to the substance of his detention must be considered under the Fourth Amendment. Southerland v. City of New York, - - - F.3d - - - -, 2011 WL 2279186, at *9 & n.13 (2d Cir. June 10, 2011).

at 104; see also van Emrik v. Chemung Cnty. Dep't of Soc. Servs., 911 F.2d 863, 866 (2d Cir. 1990). Detention to serve that interest is warranted where the state has a "reasonable basis" to believe that a child has been the victim of abuse and that detention is necessary to protect the child from further harm. Wilkinson, 182 F.3d at 104 (internal quotation marks omitted). That standard "reflects the recognized need for unusual deference in the abuse investigation context." Id.

The Second Circuit has also said that detention to serve the interest in protecting children from abuse is warranted where, although "the primary evidence of abuse ha[s] been discredited," the state requires time to process the fact that evidence has been discredited and to determine the most sensible course of action moving forward. Kia P., 235 F.3d at 759.

The Second Circuit has held that brief separations of child and parent "generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal." Nicholson v. Scoppetta, 344 F.3d 154, 172 (2d Cir. 2003); see also Southerland, - - - F.3d at - - - - , 2011 WL 2279186, at *17 ("We have also recognized that substantive due process claims in the child-removal context have a temporal dimension."); Tenenbaum, 193 F.3d at 600.

In this case, no reasonable jury could find that the medical defendants' decision to hold T.S. from formal medical clearance to discharge was without adequate justification. The only reasonable view of the evidence is that, from August 24, 2004 to August 26, 2004, the medical defendants, at the direction of ACS, held T.S. while ACS litigated its removal order in family court (at a hearing at which V.S. and Ve.S. were present) and also evaluated the home of T.S.'s father (and reviewed a paternity petition) to determine whether discharge into the custody of the father was in T.S.'s best interests. In fact, all but a few hours of this detention took place after

16

the family court had sanctioned ACS's decision to remove T.S. from the care of his mother and grandmother.

Detention pending the outcome of limited litigation and the evaluation of potential post-discharge environments is "not without a reasonable basis" or "without any reasonable justification in the service of a legitimate governmental objective." Kia P., 235 F.3d at 759 (internal quotation marks omitted).

The plaintiffs' answer to this analysis seems to be that the medical defendants should have known by August 24, 2004 that T.S. had not been the victim of abuse and so had an obligation not to accommodate the ACS process. (Pl. Br. at 24–26.) Even if this argument accurately characterizes the medical defendants' legal obligations, it does not accurately characterize the record supporting the detention order. To be sure, by August 24, 2004, the evidence that T.S. had been the victim of abuse was not as strong as it was when T.S. initially presented at the hospital. As the plaintiffs observe, by August 24, 2004, Schneider doctors had determined that T.S. did not have a skull fracture and that the skeletal survey revealed no evidence of past abuse. Moreover, Dr. Jenssen had apparently concluded that Ve.S.'s description of an accidental fall she had taken in her kitchen might very well explain T.S.'s broken femur and bruised forehead.

Nonetheless, there was still evidence of abuse sufficient to support the ACS's initial removal order and the family court's subsequent approval of that order. Initially, Ve.S.'s story about falling in the kitchen had not been proved definitively and her failure to tell the story sooner may have undercut her credibility. Moreover, two separate ophthalmologists who examined T.S. reported finding retinal bleeds consistent with shaken baby syndrome. Dr. Jenssen's subsequent discussion with the partner of V.S.'s obstetrician-gynecologist also

17

supported the shaken baby syndrome hypothesis as the partner reported that V.S.'s delivery had

been "uneventful," which could have supported the view that T.S.'s bleeds were not the result of

a difficult delivery.

The fact that "there was an array of benign explanations (explanations that the medical

defendants did not explore)" (Pl. Br. at 25) for the hemorrhages does not render the decision to

accommodate the ACS process, which lasted only two days, unconstitutional. See Wilkinson,

182 F.3d at 106 ("As we have emphasized, courts must apply the 'reasonable basis' test to permit

investigators considerable discretion in the abuse context. This is in keeping with the basic

precept that a mere failure to meet local or professional standards, without more, should not

generally be elevated to the status of constitutional violation."); Orlik v. Dutchess Cnty., 603 F.

Supp. 2d 632, 646–47 (S.D.N.Y. 2009) ("faulty or incorrect report" does not render separation

violation of due process because investigation that is "faulty" or conclusions that are "incorrect

or ill-advised" do not violate due process so long as actions are "consistent with some significant

portion of the evidence").

### C. Procedural Due Process

The plaintiffs also summarily argue that, even if the medical defendants had sufficient

justification for detaining T.S., the plaintiffs were not provided the procedural protections

guaranteed them by the Constitution.[2]  (Pl. Br. at 24.)

The medical defendants answer that the plaintiffs received a family court hearing on the

same day that the state-actor detention began and that the "less than an hour" between removal

and hearing was constitutional.  (Med. Def. Br. at 28–30.)

---

[2]  This is a claim that belongs to both of the plaintiffs. Southerland, - - - F.3d at - - - -, 2011 WL 2279186,
at *9 ("both the parents and the children may have a cause of action for violation of the Fourteenth Amendment
under a theory of denial of procedural due process").

The plaintiffs' procedural due process claim is "covered by the subset of [Second Circuit] cases addressing circumstances where the government, although not physically taking the child away from the parent, gains custody of the child by refusing to release him or her after the parent has voluntarily granted temporary custody to the government or a third party." Kia P., 235 F.3d at 760; see also Cecere v. City of New York, 967 F.2d 826, 830 (2d Cir. 1992); Duchesne v. Sugarman, 566 F.2d 817, 822–23 (2d Cir. 1977).

"The rule in this Circuit is that under these circumstances the State has a duty to initiate a 'prompt' post-deprivation hearing after the child has been removed from the custody of his or her parents." Kia P., 235 F.3d at 760 (citing Gottlieb, 84 F.3d at 520). There is no requirement for a pre-deprivation hearing, which is usually required in non-emergency circumstances, as "the Hospital already had custody of [T.S.] at the moment [he] was medically cleared." Id. at 760 n.4.

As a matter of law, the plaintiffs were provided a prompt post-deprivation hearing in this case. Here, the removal order was presented to a family court judge on August 24, 2004, on the very same day on which the medical defendants took custody of the child as state actors. The plaintiffs have provided no explanation for why this post-deprivation hearing was not sufficiently prompt, and the Court concludes that, as a matter of law, it was. See id. at 761; Cecere, 967 F.2d at 830 (permitting four day deprivation in the face of evidence of abuse); Taylor v. Evans, 72 F. Supp. 2d 298, 307–08 (S.D.N.Y. 1999) (four-day period was "short-lived and relatively non-disruptive" and consistent with due process); Dietz v. Damas, 932 F. Supp. 431 (E.D.N.Y. 1996) (twelve day delay reasonable).

### D. Fourth Amendment

The Court also understands the plaintiffs to be arguing that the same state-actor detention that violated the Due Process Clause also violated T.S.'s rights under the Fourth Amendment. The medical defendants' answer to this claim is similar to the answer to the due process claims: "it was objectively reasonable for the medical defendants to comply with ACS's instructions and await further information from ACS regarding T.S.'s discharge." (Med. Def. Br. at 36–37.)

The Second Circuit has not clearly explained "which of three modes of determining whether a seizure was 'reasonable' under the Fourth Amendment should apply in cases where the state seizes a child in order to prevent abuse or neglect." Kia P., 235 F.3d at 762. That is, it is not clear whether the state requires probable cause, or whether "special needs" justify application of a "less stringent reasonableness requirement," or whether detention can only be justified by "exigent circumstances." Id. (discussing Tenenbaum, 193 F.3d at 603–05).

In any event, like the Second Circuit in Kia P., the Court need not resolve this issue. This is because, under any standard, the medical defendants' detention of T.S. in this case did not violate the Fourth Amendment "for substantially the same reasons that militate against [the] finding of a due process violation." Id. at 762–63.

### III. Medical Defendants: Unconstitutional Testing

The plaintiffs also claim that the medical defendants violated T.S.'s Fourth Amendment rights when they subjected him to certain medical testing. The plaintiffs argue that the medical defendants, "under color of state law," ordered a head CT scan, an MRI, a skeletal survey, and two ophthalmological exams, "all of which were medically unnecessary." (Pl. Br. at 26.)

The medical defendants' response is twofold. They argue first that their actions were not subject to Fourth Amendment scrutiny because the tests were not ordered by ACS but were

conducted for medical purposes.  (Med. Def. Br. at 34–35; Med. Def. Reply at 20–21.)
Alternatively, they argue also that even if their actions are subject to Fourth Amendment
scrutiny, their actions were reasonable.  (Med. Def. Reply at 21–22.)

In arguing for liability, the plaintiffs rely on the Second Circuit's holding that "the
Constitution assures parents that, in the absence of parental consent, x-rays of their child may not
be taken for investigative purposes at the behest of state officials unless a judicial officer has
determined . . . that grounds for such an examination exist."  van Emrik, 911 F.2d at 867.

In van Emrik, the plaintiffs sued government investigators who, against the advice of a
doctor, ordered the doctor to perform potentially harmful x-rays to identify "previous fractures
elsewhere in the child's body that had gone undetected and had since healed."  Id.  In that case,
the Second Circuit ruled that the government defendants could be liable.

The plaintiffs also rely on the Second Circuit's application of the van Emrik holding to
hold that the Fourth Amendment regulates a government investigator who brought a young girl
who was the suspected victim of sexual abuse to a hospital and asked a doctor to perform a
physical examination the girl, which examination aimed to discover signs of sexual abuse.
Tenenbaum, 193 F.3d at 597–99.  In Tenenbaum, the court rejected the argument that the
government need not secure consent or a court order where the test, which was ordered by an
investigator "for the purpose of determining whether [sexual] abuse had occurred," might have
uncovered injuries in need of treatment; that fact did not render the test "medically indicated and
designed for treatment."  Id. at 599.  In reaching that result, the Second Circuit compared the
facts of the case with the facts of two district court cases in which government defendants were
held not liable for tests performed on children who were the suspected victims of abuse and who
were brought, by government investigators, to hospitals for examination.

21

In one of those cases, <u>Chayo v. Kaladjian</u>, x-rays were ordered on a child with a visible bruise on his head to facilitate a diagnosis of the nature of the injury and to "determine what treatment, if any, was necessary." 844 F. Supp. 163, 169 (S.D.N.Y. 1994). The district court concluded that the rule of <u>van Emrik</u> did not apply because (a) "the x-ray examinations were ordered not by the caseworkers but by Dr. Ibrahm Ahmed, a pediatric resident at St. Vincent's Hospital" and (b) the x-rays were ordered "for medical rather than investigative purposes." <u>Id.</u>

The plaintiffs in that case argued for liability on the ground that the "medical records state that the purpose of the medical examinations, including the x-rays, was to make sure the children are not being abused." <u>Id.</u> at 170 n.2 (internal quotation marks and emphasis deleted). The court rejected that argument because the cited records did not bear directly on Dr. Ahmed's reasons for ordering the tests and because, "[m]ore importantly, it does not in any way suggest that the caseworkers requested the x-rays." <u>Id.</u>

The second case discussed by the Second Circuit was <u>Schwimmer v. Kaladjian</u>, in which the plaintiffs sought to hold liable two government agencies and agency employees for the fact that a doctor at Beth Israel ordered, without judicial process, "two sets of x-rays . . . , both skull and skeletal series," on a child who was brought to the hospital by two police officers and who was covered with ecchymotic lesions. 988 F. Supp. 631, 637 (S.D.N.Y. 1997).

In <u>Schwimmer</u>, the district court ruled that the "analogy . . . to the child in <u>van Emrik</u> is inappropriate" because "the record is devoid of evidence that [ACS employees] directed Beth Israel to take skeletal x-rays of [the child] for investigatory purposes and that the x-rays were 'not medically necessary or advisable.'" <u>Id.</u> at 641. Although the case does not discuss the fact, there does not appear to have been any suggestion that the tests in <u>Schwimmer</u> would identify an injury in need of treatment.

The plaintiffs in this case focus on whether the tests at issue were investigative. The plaintiffs' claim in this case fails because no reasonable jury could find for them on an issue that is antecedent to that question; namely, whether ordering the tests was state action. No reasonable jury could find that the medical defendants performed the challenged tests in this case as state actors. The Kia P. state action test, which the Court detailed earlier, compels this result.

The record is clear that ACS did not order the tests at issue. T.S. voluntarily arrived at Schneider and, as the plaintiffs state in their papers, "before ACS even arrived at the hospital," Schneider doctors "order[ed] [the] MRI, skeletal survey and ophthalmological exam" that are challenged as unconstitutional in this case. (Pl. Br. at 19.) There is no evidence that the medical defendants ordered the tests because the state—or Schneider, implementing a state policy— required that private physicians perform medical tests to confirm a suspicion of child abuse. The Schneider policy concerning children who are the suspected victims of abuse, which the parties have provided the Court, makes no mention of testing. (Ex. 21.)

More important, the record reveals a medical, non-ACS purpose for the challenged tests. Initially, there does not appear to be any real dispute that the head CT scan and MRI were performed for treatment purposes. Although the plaintiffs mention those tests in the portion of their brief that argues for Fourth Amendment liability, their real challenge, as revealed by the substance of the briefs and the oral argument, is aimed at the skeletal survey and the eye examination.

With respect to those tests, the plaintiffs' expert, Dr. Phyllis Weiner, testified that the skeletal survey could not have been undertaken to facilitate treatment because a doctor looking for fractures would not perform a skeletal survey, which would reveal only old, healed breaks. (Ex. 34 at 270.) The record supports a similar finding with respect to the eye examination,

23

because all agree that retinal bleeds cannot be treated. But Dr. Weiner also testified that skeletal surveys have a medical purpose in that they are a "routine part of a child abuse workup." (Id.) There does not appear to be any dispute that the same is true of the retinal exams. Thus there is unchallenged evidence that a private medical professional, exercising medical judgment, would—as the medical defendants say they did here—order these exams as part of a diagnostic workup without regard to ACS. This evidence reflects the fact that the professional concerns of physicians like those involved in this case are not as narrow as the plaintiffs appear to believe (i.e. "treatment" and only "treatment").

The Court is not persuaded that the fact that private doctors, when ordering tests like those at issue here, know that ACS will be interested in, and may act upon, the results (insofar as they confirm or rule out child abuse) means that the Constitution regulates those private doctors' decisions. Cf. Blum v. Yaretsky, 457 U.S. 991, 1008–09 (1982) (state not responsible for medical decisions to discharge residents from private nursing facilities even though private party knows that state will review discharge decision and adjust benefits in response to discharge) (cited as relevant to liability determination in Kia P.).

Finally, the Court observes that the plaintiffs have not provided the Court a single case in which a private doctor—or, derivatively, a hospital—has been subject to Fourth Amendment scrutiny for the decision to order tests designed to confirm a suspicion that an unexplained injury on a child whose parents voluntarily brought him to the hospital was the result of abuse. Absent such authority, the Court is not inclined to subject private doctors or hospitals to Fourth Amendment regulation in the circumstances present here.

24

## IV. City Liability

The Court now turns to the constitutional claims against the City. Those claims are that the City maintained a policy of (a) unreasonably relying upon Dr. Jenssen's opinions about abuse, and (b) unreasonably continuing family court prosecutions after cause to suspect abuse has dissipated. The plaintiffs contend that those policies caused City employees to violate their constitutional rights.

The City's principal defense to these claims is that, in an earlier interlocutory appeal in this case, the Second Circuit determined that the individual City employees did not violate the Constitution when they removed T.S. from his mother and initiated and continued a child abuse prosecution. (City Def. Br. at 4–7.) The City thus contends that there can be no municipal liability under Monell v. New York City Department of Social Services, 436 U.S. 658 (1978). See Matican v. City of New York, 524 F.3d 151, 154 (2d Cir. 2008) ("The first two claims depend on a single threshold question: did the officers' actions violate Matican's constitutional rights? If they did not, then the City cannot be liable to Matican under § 1983, regardless of whether the officers acted pursuant to a municipal policy or custom.")

The plaintiffs contend that the Second Circuit decided only that the individual City employees did not act in an objectively unreasonable manner such that they could not be liable for money damages notwithstanding their unconstitutional actions. (Pl. Br. at 22–24.) The plaintiffs, citing Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003), also argue that even if the Second Circuit determined that the employees did not violate the Constitution, that determination should not affect this litigation because post-remand discovery has revealed new and significant evidence. (Id. at 25–26.) Both of these contentions lack merit.

25

The Court agrees with the City's analysis of the Second Circuit's decision. In that interlocutory appeal, the general question before the Second Circuit was whether the individual City defendants were entitled to qualified immunity. Resolution of that issue generally requires the court to decide two issues: (1) whether the plaintiffs had shown a constitutional violation; and (2) if so, whether the right violated was clearly established. See, e.g., Higazy v. Templeton, 505 F.3d 161, 169 n.8 (2d Cir. 2007); Jones v. Parmley, 465 F.3d 46, 55 (2d Cir. 2006). Answering the second question required answering the question whether "a reasonable [actor] would have known that the conduct in question was unlawful." Walczyk v. Rio, 496 F.3d 139, 166 (2d Cir. 2007) (Sotomayor, J., concurring); see also id. ("whether a right is clearly established is the same question as whether a reasonable officer would have known that the conduct in question was unlawful").

It is well settled that the Second Circuit, in determining the individual City defendants' entitlement to qualified immunity, did not have to resolve the question whether the plaintiffs had shown a constitutional violation. The Second Circuit could have simply determined that, whether or not there was a violation, no reasonable individual in the position of the individual City defendants would have understood that his or her conduct was inconsistent with the Constitution. See Pearson v. Callahan, 555 U.S. 223, 236–43 (2009).

Resolution of the qualified immunity question in the interlocutory appeal also required attention to the substantive law governing the individual defendants' conduct. As the Court has indicated, that law is that an "investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse." Wilkinson, 182 F.3d at 104–05; see also Kia P., 235 F.3d at 758–59.

26

This standard, as the Court has suggested, "permit[s] investigators considerable discretion in the abuse context." Wilkinson, 182 F.3d at 106 (citing Manzano v. S.D. Dep't of Soc. Servs., 60 F.3d 505, 513 (8th Cir. 1995) ("Although the record reveals an investigation which appears far from textbook perfect, the record of the investigation . . . does not demonstrate conduct so outrageous that it offends the substantive component of the Due Process Clause.")).

Turning to the opinion of the Second Circuit, although it is not as clear with respect to the issue now in dispute as it might be, the best reading of that opinion is that the Second Circuit held that the City employees did not violate the Constitution because they had a reasonable basis to initiate and continue removal proceedings, as well as to prosecute V.S. for child abuse.

With respect to the decision to initiate removal on the strength of Dr. Jenssen's diagnosis, the court said, "In the absence of any plausible alternative, this was sufficient to warrant the initial decision to seek a court order permitting T.S.'s removal from V.S.'s custody." V.S. v. Muhammad, 595 F.3d at 431.

With respect to the continuing prosecution, "When, at the subsequent hearings, not only Dr. Esernio-Jenssen but also Dr. Shakin reaffirmed the diagnosis of shaken baby syndrome, there remained ample basis for defendants to continue with both custody removal and charges of abuse." Id. The court also rejected the argument that the individual City defendants had an obligation to inform the family court that T.S. had been in Ve.S.'s care at the time of his injury; the court held that V.S., who was at the hearing and represented by counsel, could have raised the issue herself. Id.

With respect to the argument that the individual defendants should have investigated Dr. Jenssen's history of misdiagnoses so as to learn that her opinion did not provide reasonable cause, the court held, "to impose on an ACS caseworker the obligation in such circumstances of

assessing the reliability of a qualified doctor's past and present diagnoses would impose a wholly unreasonable burden of the very kind qualified immunity is designed to prevent." Id.

Moreover, the court further held that even if the defendants knew that Dr. Jenssen had a poor reputation, "it still would not have been unreasonable for them to rely on [her] diagnosis of T.S. in these circumstances." Id. This was true, at least in part, because Dr. Jenssen's opinion about child abuse was based on the diagnosis of Dr. Kodsi, an ophthalmologist who had identified retinal bleeds consistent with shaken baby syndrome, and was shared by Dr. Shakin, "another well qualified physician." Id.

The only fair reading of the portions of the opinion just described is that, in the view of the Second Circuit, the individual City defendants did not violate the Constitution. The opinion clearly holds that with respect to the initial decision to begin removal proceedings and with respect to the decision to continue removal and press the abuse charges. The Second Circuit found those decisions to have been reasonable in view of the evidence available.

Moreover, with respect to the plaintiffs' central argument in this case—that the individual City defendants unreasonably relied on Dr. Jenssen's opinion, given her background—the Second Circuit also pretty clearly rejected the plaintiffs' position on its constitutional merits. The court said that, in this specific case, knowledge of Dr. Jenssen's background was not significant and that the defendants acted reasonably in relying on her opinion that T.S. had been the victim of abuse.

But the court also appears to have rejected on the merits the idea that caseworkers in any case have an obligation to inform themselves of the track record of "qualified doctors." The court did state that such a burden was inconsistent with "qualified immunity." But it is difficult to imagine that the Second Circuit meant only that in this case it was not objectively

28

unreasonable to act without knowledge of the qualified doctor's background. Such a holding would mean that ACS employees generally have an obligation to inform themselves of a qualified doctor's reputation, which in turn would mean that ACS investigators in future cases could not avoid personal damages liability where they failed to honor an obligation that the Second Circuit described as "wholly unreasonable."

The Court is not persuaded by the plaintiffs' alternative argument that the decision of the Second Circuit should not bind the Court because new evidence has emerged since the interlocutory appeal was decided. That "new" evidence is only more evidence of the fact that the City did not instruct its abuse investigators to investigate the background of physicians upon whom they were relying and also more evidence about Dr. Jenssen's poor track record for diagnosing child abuse. (Id.) Even if new evidence could be employed to undermine the Second Circuit's liability finding, this new evidence does not warrant any court revisiting that finding. The evidence is further evidence of the fact that the individual defendants were not instructed about how to do something—investigate physician track records—that the Second Circuit said, as a matter of law, the investigators did not have to do in this case.

The evidence is also simply further evidence of a fact—Dr. Jenssen's reputation—that the Second Circuit said was not significant to this case because Dr. Jenssen's opinion was corroborated by the opinion of Dr. Shakin, whose reputation no one has challenged. This "new evidence" thus does not change the liability of the individual defendants and the City.

## V. State Law Claims

The Court now turns to the plaintiffs' remaining state law claims, which are claims against the medical defendants alleging malicious prosecution, unlawful imprisonment, gross negligence, and medical negligence.

As an exercise of discretion, the Court may refuse to exercise jurisdiction over these claims. See Matican, 524 F.3d at 154–55 ("if Matican has no valid claim under § 1983 against any defendant, it is within the district court's discretion to decline to exercise supplemental jurisdiction over pendent state-law claims").

The Court concludes that considerations of "'judicial economy, convenience, fairness, and comity'" do not warrant adjudication of these claims in federal court. Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). The Court appreciates that the plaintiffs have committed substantial resources to litigating this case in federal court, but, relevant here, almost none of those resources were devoted to developing facts unique to the state law claims; those facts are relevant in the main to the federal claims, too.

Moreover, none of the state law claims is of special federal concern and the gross negligence claim, which appears in large part to respect actions taken pursuant to New York's mandatory reporting law, as well as the medical negligence claim, present issues of special concern to New York. Consequently, the state law claims belong in New York's courts.

## CONCLUSION

For the reasons stated, the defendants are entitled to summary judgment on the plaintiffs' constitutional claims. The Court declines to exercise jurisdiction over the state law claims.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      September 2] , 2011

                                  s/CBA

                                Carol Bagley Amon
                                Chief United States District Judge